**UNITED STATES COURT OF APPEALS**
**Tenth Circuit**
**Byron White United States Courthouse**
**1823 Stout Street**
**Denver, Colorado 80294**
**(303) 844-3157**

**Patrick J. Fisher, Jr.**                                                                                  **Elisabeth A. Shumaker**
**Clerk**                                                                                                      **Chief Deputy Clerk**

July 24, 1997

**TO:**    All recipients of the captioned opinion

**RE:**    95-2121, Kerr-McGee v. Farley
95-2127, Kerr-McGee v. Farley
June 25, 1997

Please be advised of the following correction to the captioned decision:

Due to a clerical error, names of counsel appearing on the appellees' supplemental brief were omitted from the attorney designation list.

A corrected version of that page of the opinion is attached for your convenience.

Very truly yours,

Patrick Fisher, Clerk

Susie Tidwell
Deputy Clerk

encl.

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 25 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

KERR-MCGEE CORPORATION,

 Plaintiff - Appellant,

 and

CYRUS FOOTE MINERALS
CORPORATION; RIO ALGOM, LTD.;
UMETCO MINERALS
CORPORATION; UNION CARBIDE
CORPORATION,

 Plaintiffs,

v.

KEE TOM FARLEY, individually and
on behalf of the Estate of Lucy K.
Farley; CARMELITA FARLEY JOE;
HAROLD KADY, SR., individually
and on behalf of the Estate of Julia
Mae Kady,

 Defendants - Appellees.

No. 95-2121

---

KERR-MCGEE CORPORATION; RIO
ALGOM, LTD.; UMETCO
MINERALS CORPORATION; UNION
CARBIDE CORPORATION,

 Plaintiffs,

and

CYRUS FOOTE MINERALS
CORPORATION,

      Plaintiff - Appellant,

v.

KEE TOM FARLEY, individually and
on behalf of the Estate of Lucy K.
Farley; CARMELITA FARLEY JOE;
HAROLD KADY, SR., individually
and on behalf of the Estate of Julia
Mae Kady,

      Defendants - Appellees.

No. 95-2127

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CIV-95-438-MV)**

---

Michael R. Comeau of Carpenter, Comeau, Maldegen, Nixon & Templeman,
Santa Fe, New Mexico (Tom Galbraith and R. Neil Taylor, III of Lewis & Roca,
Phoenix, Arizona, and Robert N. Hilgendorf, Santa Fe, New Mexico, for
Appellant Cyprus Foote Minerals Corporation; Jon J. Indall and Stephen J. Lauer
of Carpenter, Comeau, Maldegen, Nixon & Templeman, Santa Fe, New Mexico,
for Appellant Kerr-McGee Corporation, with him on the briefs) for Appellants.

Suzelle M. Smith of Howard and Smith, Los Angeles, California (Cherie V. Daut,
Shiprock, New Mexico; Justin R. Melat and Rebecca A. Lorenz of Melat,
Pressman, Ezell & Higbie, Colorado Springs, Colorado, with her on the brief);
and Seth R. Lesser, Richard A. Speirs, and Lisa K. Buckser of Bernstein,
Litowitz, Berger & Grossmann, L.L.P., New York, New York, for Appellees.

---

Before **SEYMOUR**, Chief Judge, **LOGAN** and **LUCERO**, Circuit Judges.

**LUCERO**, Circuit Judge.

This case involves the scope of the tribal exhaustion rule in the context of the Price-Anderson Act. Appellants Kerr-McGee and Cyprus Foote Minerals (collectively "Kerr-McGee") filed a claim in the District of New Mexico for a declaratory judgment and preliminary injunction, arguing that the Navajo Tribal Court is without jurisdiction to adjudicate nuclear tort claims against Kerr-McGee. Applying the tribal exhaustion rule, the district court denied the injunction and stayed further action in federal court until the tribal court ruled on jurisdiction. Our jurisdiction to hear Kerr-McGee's interlocutory appeal arises under 28 U.S.C. § 1292(a)(1). We affirm.

## I. BACKGROUND

Kerr-McGee milled uranium on the Navajo Reservation between 1952 and 1973, leasing land for the mill site from the tribe. Kerr-McGee sold the mill's entire production to the federal government. In 1995, defendants (the "Tribal Claimants"), who are members of the Navajo Tribe and residents of the reservation, filed a complaint in Navajo Tribal Court, alleging that the Kerr-

- 3 -

McGee mill released vast quantities of radioactive and toxic materials, causing them injuries. Before the tribal court had proceeded with the case, Kerr-McGee filed the instant suit.

In the district court, Kerr-McGee argued that the tribal court had no jurisdiction to consider nuclear tort claims and should be enjoined in its proceedings, basing its conclusion on the Price-Anderson Act, 42 U.S.C. § 2011 *et seq.* Kerr-McGee contends that the Price Anderson Act grants exclusive federal jurisdiction over nuclear torts if a defendant so wishes. The district court disagreed, finding that the Price-Anderson Act does not specifically divest tribal courts of jurisdiction over such claims. Because there is no explicit mention of exclusive federal court jurisdiction over Price-Anderson claims, the district court reasoned that the tribal court should ordinarily be given the first opportunity to determine its own jurisdiction. Moreover, because the Tribal Claimants alleged a cause of action based on torts committed on the reservation, the district court felt no need to engage in any extended comity analysis regarding the decision to defer to the Navajo Tribal Court. It concluded that the proper practice was to stay the federal court proceedings until the tribal court had determined its jurisdiction.

Thereafter, the District Court of the Navajo Nation issued an order finding tribal court jurisdiction over the tort claims asserted by the Tribal Claimants. Farley v. Kerr-McGee, No. 103-95 (Navajo D. Ct. Aug. 1, 1996). Specifically,

the Navajo court held that the Price-Anderson Act does not preempt the Tribal Claimants' Navajo law right to tribal court adjudication of the alleged torts. In fact, the Navajo court concluded that the Price-Anderson Act does not apply at all to the Tribal Claimants' suit and, therefore, tribal court jurisdiction could not interfere with Congressional intent in federal regulation of nuclear activity. We are unaware of any appeal by Kerr-McGee of the Navajo District Court order.

## II. DISCUSSION

The scope of a tribal court's jurisdiction is a federal question over which federal district courts have jurisdiction. National Farmers Union Ins. Cos. v. Crow Tribe, 471 U.S. 845, 853 (1985). The district court's determination of the proper scope of the tribal exhaustion rule is reviewed de novo. Texaco v. Zah, 5 F.3d 1374, 1376 (10th Cir. 1993).

### A

The tribal exhaustion rule was created in National Farmers, a case involving a tort suit by a tribal member against a school district and its insurer. The tribal member brought suit in tribal court, and the defendants promptly sued in federal court for a declaration that the tribal court had no jurisdiction to entertain a civil suit against a non-Indian, even where the alleged tort took place

on the reservation.  Rather than further extending the rule in <u>Oliphant</u>[1] to tribal

jurisdiction over civil matters, the Supreme Court concluded:

> [T]he existence and extent of a tribal court's jurisdiction will require
> a careful examination of tribal sovereignty, the extent to which that
> sovereignty has been altered, divested, or diminished, as well as a
> detailed study of relevant statutes, Executive Branch policy as
> embodied in treaties and elsewhere, and administrative or judicial
> decisions.

<u>National Farmers</u>, 471 U.S. at 856.  Moreover, "that examination should be

conducted in the first instance in the Tribal Court itself."  <u>Id.</u>   This rule of tribal

court exhaustion is subject to a narrow set of exceptions, including: (1) "where an

assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in

bad faith"; (2) "where the action in tribal courts is patently violative of express

jurisdictional prohibitions"; or (3) "where exhaustion would be futile because of

the lack of an adequate opportunity to challenge the tribal court's jurisdiction."

<u>Id.</u> at 857 n.21 (internal quotation and citation omitted).

The tribal exhaustion rule was extended and explained in <u>Iowa Mutual

Insurance Co. v. LaPlante</u>, 480 U.S. 9 (1987).  There, the Court held that the

statute granting federal courts jurisdiction over diversity actions, 28 U.S.C. §

1332, does not divest tribal courts of jurisdiction over acts involving non-Indians

---

[1] In <u>Oliphant v. Suquamish Indian Tribe</u>, tribal courts were found to lack criminal jurisdiction over non-Indians for crimes committed on the reservation.  435 U.S. 191, 208-12 (1978).

taking place on tribal land. With respect to the exhaustion requirement, the Court held that "proper respect for tribal legal institutions requires that they be given a 'full opportunity' to consider the issues before them and 'to rectify any errors.'" Id. at 16 (quoting National Farmers, 471 U.S. at 857). Because "the federal policy of promoting tribal self-government encompasses the development of the entire tribal court system . . . exhaustion of tribal remedies means that tribal appellate courts must have the opportunity to review the determinations of the lower tribal courts." Id. at 16-17. Consequently, federal courts should not intervene until the tribal courts have had a full opportunity to evaluate jurisdiction. Id. at 17.

The precise question we address is not whether the Navajo courts have jurisdiction over the claims brought by the Tribal Claimants, but whether the Price-Anderson Act so obviously preempts tribal jurisdiction that an action in tribal court "would be patently violative of express jurisdictional prohibitions," and that abstention in favor of tribal exhaustion is inappropriate. National Farmers, 471 U.S. at 856 n.21. A substantial showing must be made by the party seeking to invoke this exception to the tribal exhaustion rule. See Iowa Mut., 480 U.S. at 19 n.12 (party's assertion that "tribal court jurisdiction over outsiders 'is questionable at best,'" insufficient to defeat the tribal exhaustion requirement). In fact, tribal courts rarely lose the first opportunity to determine jurisdiction

because of an "express jurisdictional prohibition." Cases in which tribal courts are not given the first opportunity to determine their jurisdiction typically involve situations where the federal court has exclusive jurisdiction, see Blue Legs v. Bureau of Indian Affairs, 867 F.2d 1094, 1097-98 (8th Cir. 1989), or where tribal jurisdiction is foreclosed by sovereign immunity, see United States v. Yakima Tribal Court, 806 F.2d 853, 860-61 (9th Cir. 1986).

Kerr-McGee makes two tightly interwoven arguments in support of its position that Price-Anderson contains an "express prohibition" on tribal court jurisdiction despite the absence of statutory language explicitly addressing tribal fora. First, Kerr-McGee notes that 1988 amendments to Price-Anderson create specific procedures for adjudicating nuclear torts in federal court, and provide for an absolute right of removal to federal court. These procedures were explicitly designed to consolidate jurisdiction over claims arising from a nuclear incident in a single federal forum. Allowing jurisdiction to arise in "any one of a patchwork of tribal judicial entities that exist throughout the West," Appellant's Br. at 19, would run counter to the express purposes of the Act as amended in 1988. Thus, the Price-Anderson Act and its amendments have expressly provided for exclusive federal court jurisdiction in this case, and the tribal court's assertion of authority is "patently violative of express jurisdictional prohibitions." National Farmers, 471 U.S. at 857 n.21. Second, even if we do not read the Price-Anderson Act

amendments to create exclusive federal court jurisdiction, Kerr-McGee claims that because the federal government has preempted the entire field of nuclear torts, tribal jurisdiction, whether regulatory or adjudicatory, will not lie unless specifically provided for by statute. Under either argument, Kerr-McGee asserts jurisdiction is indirectly but expressly prohibited.

The Tribal Claimants dispute Kerr-McGee's construction of the law. They argue that even if federal regulation has limited tribal regulatory authority over Kerr-McGee's uranium milling, that does not imply adjudicatory preemption in the circumstances of this case. Given Price-Anderson's silence, civil jurisdiction over the activities of non-Indians on reservation land should be presumed to lie with the tribal court even if Congress has chosen to federalize the substantive law governing those activities. That presumption could be overcome, but only by an express statement removing tribal court adjudicatory authority, and Price-Anderson contains no such statement. Alternatively, plaintiffs contend that Price-Anderson does not apply to this case at all because Kerr-McGee does not have an indemnity agreement with the federal government. To assess these various competing arguments, we turn to the genesis and development of the Price-Anderson "system" governing nuclear torts, and determine how far down the road of exclusive federal court jurisdiction Congress went in the Price-Anderson 1988 amendments.

**B**

The Atomic Energy Act (AEA) was created in 1954 to facilitate a transition from a federal government monopoly over the production and use of atomic materials to a regime in which private industry also would have a role in their production and use. Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Dev. Comm'n, 461 U.S. 190, 206-07 (1983). Limiting the states' role in regulating atomic energy, Congress granted a federal agency, the Atomic Energy Commission (later the Nuclear Regulatory Commission), "exclusive jurisdiction to license the transfer, delivery, receipt, acquisition, possession, and use of nuclear materials." Id. at 207. Hazards arising from atomic radiation were made a particularly federal concern, as to which the states had no authority to regulate. Id. at 209-10. Accordingly, with very few exceptions, state attempts to regulate in this area are preempted.

In 1957, Congress amended the AEA through the Price-Anderson Act (PAA), creating specific protections from tort liability for the nuclear industry. See Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 251 (1984). The PAA contains three distinct elements: (1) an aggregate ceiling on the liability for nuclear tort claims; (2) a "channeling of liability" to protect private entities from liability for their indirect participation in atomic development; and (3) an indemnification program, through which the federal government would require

- 10 -

private insurance coverage to a certain level, and pay public liability claims above that amount, up to the liability ceiling created by the PAA.  In re TMI Litig. Cases Consol. II ("TMI II"), 940 F.2d 832, 852 (3d Cir. 1991).  While the PAA specifically made nuclear industry liability a federal concern, Congress initially chose not to create a specific federal cause of action for nuclear torts; rather, the legislative history suggests that Congress was content to allow liability to be dictated by existing causes of action.  Silkwood, 464 U.S. at 252-55 (finding state punitive damages statute not preempted by the PAA).

The PAA has been amended several times, further refining the relationship between federal and state roles regarding nuclear torts, and the protections to be afforded private industry and the general public.  Recent amendments, the Price Anderson Amendments Act of 1988, Pub. L. No. 100-408, 102 Stat. 1066 (1988) ("1988 Amendments"), which is the law at issue in this case, arose out of congressional understanding that the Price-Anderson system "provides persons seeking compensation for injuries as a result of a nuclear incident with significant advantages over the procedures and standards for recovery that might otherwise be applicable under State tort law. . . . [It] also provides a mechanism whereby the federal government can continue to encourage private sector participation in the beneficial uses of nuclear materials."  S. Rep. No. 100-218, at 4 (1988).  While not otherwise superseding the decision in Silkwood, the 1988 Amendments

can be read in part as a congressional response to the result in <u>Silkwood</u> suggesting that the PAA never preempts state punitive damages awards. <u>TMI II</u>, 940 F.2d at 870 n.3 (Scirica, J., concurring).

The 1988 Amendments expand federal jurisdiction over claims arising out of a "nuclear incident":

> With respect to any public liability action arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident takes place . . . shall have <u>original jurisdiction</u> without regard to the citizenship of any party or the amount in controversy. Upon motion of the defendant or of the Commission, or the Secretary, as appropriate, any such action pending in any State court (including any such action pending [on the date of the 1988 Amendments]) or United States district court shall be removed or transferred to the United States district court having venue under this subsection.

42 U.S.C. § 2210(n)(2) (emphasis added). A "public liability action" is defined as "any suit asserting public liability." 42 U.S.C. § 2014(hh). Moreover, a public liability action "shall be deemed to be an action arising under section 2210 of this title [which creates a federal forum for suit]." <u>Id.</u> "Public liability" is sweeping: it encompasses <u>any</u> legal liability from "nuclear incidents," which in turn are defined in § 2014(q) to include any occurrence causing any personal or property damage arising out of the toxic, radioactive, explosive or other hazardous properties of atomic or byproduct materials. 42 U.S.C. § 2014(w).

The 1988 Amendments also create other federal rules with respect to public liability actions. Section 2210(n)(3) creates specific federal court procedures for

dealing with a mass nuclear incident, including a mechanism to fashion a caseload management panel empowered to consolidate claims and develop procedures for their resolution. 42 U.S.C. § 2210(n)(3). While creating a federal cause of action over "nuclear incidents," the 1988 Amendments explicitly state that the substantive rules of decision for a public liability action "shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section." 42 U.S.C. § 2014(hh).

From this framework, it is apparent that Congress intended to expand federal control over safety and liability issues involving the nuclear industry, particularly with respect to the role of federal courts in resolving liability. Prior to 1988, only a subclass of nuclear incidents, "extraordinary nuclear occurrences," triggered absolute federal rights of removal. TMI II, 940 F.2d at 853 n.18. Kerr-McGee notes that defendants may now choose to have federal courts, rather than state, determine liability even though the substantive rule of decision may derive from state law, and argues from that proposition that, together with the creation of specific procedural mechanisms in federal courts to deal with complex or extensive nuclear incident litigation, the framework suggests a congressional interest in allowing litigants to make federal courts the home for such litigation.

The Tribal Claimants first contend that we need not even consider the jurisdictional provisions of the 1988 Amendments. Citing Silkwood, they assert

that the PAA system simply does not apply to this case because Kerr-McGee does not have an indemnity agreement with the federal government. This argument misreads Silkwood, which simply refused to apply the indemnification provisions of the PAA to the claim in that case because the defendant lacked the necessary indemnity agreement. Silkwood, 464 U.S. at 252 n.12. Nothing in Silkwood suggests that the absence of an indemnity agreement makes the PAA's jurisdictional provisions inapplicable. Furthermore, as quoted above, the jurisdictional provisions of the PAA, 42 U.S.C. §§ 2014(w), 2210(n), as amended by the 1988 Amendments, appear broad enough to create a federal forum for any tort claim even remotely involving atomic energy production. The PAA on its face provides the sole remedy for the torts alleged in this case, and we must therefore consider its jurisdictional provisions.

**1**

Kerr-McGee argues that the PAA's jurisdictional and liability provisions strongly suggest Congress intended something very close to exclusive jurisdiction: under the 1988 Amendments, the plaintiff to a nuclear incident claim can bring her case in federal court if she wants, and the defendant has the absolute right of removal from state court. As the legislative history of the 1988 Amendments indicates, this jurisdictional framework was intended to prevent inefficient fragmentation and inconsistent resolution of nuclear tort claims by

providing for their consolidation in federal court. See O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1102 (7th Cir. 1994) (citing S. Rep. No. 100-218, at 13; H.R. Rep. No. 100-104, pt. 3, at 30 (1988)). Yet, the Tribal Claimants correctly point out that the 1988 Amendments do not explicitly create exclusive federal court jurisdiction over nuclear incident litigation, as Congress has created, for example, in other contexts. See, e.g., Blue Legs, 867 F.2d at 1098 ("'Any action [under the relevant RCRA provision] shall be brought in the district court for the district in which the alleged violation occurred.'" (quoting 42 U.S.C. § 6972(a)) (emphasis added)). That said, Congress may have intended the option of voluntary removal—which it did not provide in RCRA—because the federal substantive rule of decision is still based in part on state law. See 42 U.S.C. § 2014(hh). It could thus be argued that state courts are left with jurisdiction not for federalism-driven comity reasons, but rather for efficiency reasons. The argument pressed by Kerr-McGee, that there exists a jurisdictional prohibition on all forums not mentioned in the 1988 Amendments, has some force.

In the end, however, we are not persuaded that the PAA regime expressly prohibits the exercise of tribal jurisdiction. The PAA does not include removal from tribal courts in its jurisdictional grant, and we are unwilling to speculate on what Congress might have done with public liability actions commenced in the

- 15 -

tribal courts. We cannot conclude that the 1988 Amendments created an exclusive enclave of federal adjudicatory control such that tribal courts lack jurisdiction to decide PAA claims, even those arising out of torts against tribal members on the reservation.[2] Becenti v. Vigil, 902 F.2d 777 (10th Cir. 1990), is instructive. There, we held that the federal removal statute for claims against federal officers, 28 U.S.C. § 1442(a)(1), does not authorize removal from tribal courts. Id. at 780. The rationale for the removal statute, forbidding federal officers from being forced to answer for their conduct in any but a federal forum, mirrors the PAA's interest in allowing any party to a nuclear incident to take advantage of the federal forum. While Becenti asks whether a statute conferring jurisdiction on federal courts for certain claims filed first in state court also includes jurisdiction for similar claims filed first in tribal court, here we face the question of whether a statute that almost completely consolidates state court jurisdiction in federal courts should be read to strip jurisdiction from tribal courts as well. We follow the rationale of Becenti and conclude that federal jurisdiction

---

[2]Kerr-McGee seizes on language from Smith v. General Electric Co., 938 F. Supp. 70, 75 (D. Mass. 1996), a district court case it brought to our attention after oral argument in this case. Smith states that the 1988 Amendments "created a jurisprudential curiosity, an action grounded in state law committed to the exclusive jurisdiction of the federal courts." Id. Smith, however, does not address the issue of tribal jurisdiction and cannot be read to speak to the question presented here.

grants are read parsimoniously to elide collision with tribal court jurisdiction. Simply put, "exclusive jurisdiction" is not conferred unless conferred explicitly.

**2**

Once we conclude that the PAA's jurisdictional provisions do not create exclusive federal court jurisdiction over nuclear incidents, the Tribal Claimants urge us to apply the basic jurisdictional presumption of <u>Iowa Mutual</u>, namely that tribal civil jurisdiction over "activities of non-Indians on reservation lands . . . presumptively lies in the tribal courts unless affirmatively limited by a specific treaty or provision or federal statute." <u>Iowa Mut.</u>, at 18 (citing <u>Montana</u>, 450 U.S. at 565-66) (further citations omitted). "'Because the Tribe retains all inherent attributes of sovereignty that have not been divested by the Federal Government, the proper inference from silence . . . is that the sovereign power . . . remains intact.'" <u>Id.</u> (quoting <u>Merrion v. Jicarilla Apache Tribe</u>, 455 U.S. 130, 148 n.14 (1982)). Noting the PAA's silence with respect to tribal court jurisdiction, the Tribal Claimants contend that we must presume the Navajo courts retain jurisdiction to adjudicate the tort claims. Certainly, they argue, statutory silence cannot be converted into an "express jurisdictional prohibition" on the exercise of tribal adjudicatory authority.

Relying primarily on <u>Montana</u>, 450 U.S. 544, Kerr-McGee urges a different presumption from silence in cases where Congress has comprehensively regulated

the field.  Kerr-McGee suggests that the <u>Iowa Mutual</u> presumption from silence does not apply in cases controlled by the PAA, because tribal adjudicatory power over such claims lies "beyond what is necessary to protect tribal self-government or to control internal relations . . . and so cannot so survive without express congressional delegation."  <u>Montana</u>, 450 U.S. at 564.  Kerr-McGee cites to other cases in which tribes are presumed to lack jurisdiction over nonmembers even without specific congressional language stripping tribal authority.  In <u>South Dakota v. Bourland</u>, 508 U.S. 679 (1993), the Court held that a tribe lacked regulatory authority to license nonmember hunters and fishermen for activity on reservation lands that the federal government was extensively regulating for public purposes.  Four years earlier, in <u>Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation</u>, 492 U.S. 408 (1989), the Court found that the tribe lacked authority to zone activities of nonmembers on open fee lands within the reservation.  Kerr-McGee argues that the PAA so extensively regulates nuclear production and development, <u>see</u> <u>Pacific Gas & Elec.</u>, 461 U.S. at 206-07, that, as in <u>Montana</u>, <u>Brendale</u>, and <u>Bourland</u>, whatever inherent sovereignty the tribe may have originally enjoyed in this area has been divested by congressional legislation.  Thus, absent a specific grant of jurisdiction, tribal authority must be presumed absent.[3]

---

[3]  Kerr-McGee also cites <u>UNC Resources, Inc. v. Benally</u>, 518 F. Supp. 1046 (D.

(continued...)

The proper inference to be drawn from silence presents questions that might require reconciling two arguably divergent strands of caselaw.[4]  This is a difficult issue, and the difficulty itself belies Kerr-McGee's assertion that tribal authority here would be "patently violative of express jurisdictional prohibitions." National Farmers, 471 U.S. at 856 n.21.[5]  Strate v. A-1 Contractors, 117 S. Ct.

[3](...continued)
Ariz. 1981) for the proposition that tribes lack jurisdiction to adjudicate claims falling within the scope of the Price-Anderson Act.  This case is outdated, however, because it incorrectly predicts the outcome in National Farmers, extending the reasoning of Oliphant to civil cases (which National Farmers specifically refused to do).  Compare Benally, 518 F. Supp. at 1051 with National Farmers, 471 U.S. at 856.  Benally also asserted that tribal jurisdiction "conflicts with the superior federal interest in regulating the production of nuclear power."  Id. at 1052.  Considering that the Benally court improperly weighed the tribal court's interest, its discussion of the federal interest in Price-Anderson Act actions must be discounted.

[4]On this point, the recently issued Supreme Court opinion in Strate v. A-1 Contractors, 117 S. Ct. 1404 (1997), is instructive.  Reviewing Strate, this panel invited the parties to submit supplementary briefs on its significance to this case.  In Strate, the Supreme Court found that, absent a treaty or statute, a tribe lacked jurisdiction to adjudicate a dispute between nonmembers of the tribe arising out of an automobile accident occurring on a state highway.  Id. at 1407-08.  Relying principally on Montana, the Court held that with respect to lands over which the tribe had ceded sovereign authority, tribal jurisdiction is substantially limited.  Id. at 1413.  After carefully reviewing Strate, we conclude it is of limited usefulness in our case.  Kerr-McGee's alleged torts did not occur on lands over which the tribe has ceded authority and control to another sovereign for an indefinite period.  Here, the lease was to a private entity and for a finite period.  The Supreme Court simply has not spoken to such a situation.  See id. at 1408 ("We express no view on the governing law or proper forum when an accident occurs on a tribal road within a reservation.")

[5]In support of its contention that an "express jurisdictional prohibition" need not be quite "express," Kerr-McGee cites Lower Brule Construction v. Sheesley's Plumbing, 84 B.R. 638 (D.S.D. 1988).  There, the district court, citing Oliphant, held that tribal

(continued...)

- 19 -

1404 (1997), relied on by Kerr-McGee, is not a tribal exhaustion case; there, the federal plaintiffs first challenged tribal jurisdiction in the tribal courts. See Strate, 117 S. Ct. 1408. Thus, the federal court never sought to identify an "express jurisdictional prohibition," but rather was in the position to address whether tribal adjudicatory power remains over civil disputes involving nonmembers on state highways within the reservation. By asking us to reach the merits of its jurisdictional challenge before it has run its course in the tribal courts, Kerr-McGee ignores the important congressional interest advanced by the tribal exhaustion rule.[6]

---

[5](...continued)
exhaustion was not necessary for an adversary proceeding in bankruptcy, even if a body of bankruptcy law existed in tribal courts. This case is notable because it appears that the underlying action (involving dishonor of a note) was originally commenced in state court, and federal courts do not constitute the exclusive forum for adjudicating "non-core" proceedings instituted before the filing of the bankruptcy petition. See 28 U.S.C. § 157(b)(4); In re Colorado Energy Supply, Inc., 728 F.2d 1283, 1285-86 (10th Cir. 1984). Thus, Lower Brule could stand for the proposition that tribal exhaustion is not necessary in areas where a federal procedure predominates. However, we find Lower Brule conclusory and unpersuasive—it assumes without analysis that a tribe has no governmental interest in a contract between the debtor and the tribe regarding a tribal housing project on the tribe's reservation. Moreover, it appears that the district court improperly melded the question of an express jurisdictional prohibition with the recognition of comity concerns.

[6]Kerr-McGee, in its supplementary brief, points to the statement in Strate that "[a]s to nonmembers, we hold, a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction." Strate, 117 S. Ct. at 1413. Kerr-McGee suggests that no adjudicative jurisdiction can exist in the Navajo tribal courts because the PAA preempts all tribal regulatory jurisdiction. Yet, even if the Supreme Court's statement can be read outside of its concern for tribal jurisdiction over non-Indian fee lands, the PAA is unclear on the

(continued...)

- 20 -

Ultimately, this case requires an attempt to accommodate two independent and important congressional concerns: comity interests flowing from tribal sovereignty and nuclear energy regulation.  Though a close question, we cannot conclude that the 1988 Amendments, or the PAA's scope generally, create an "express prohibition" to tribal court jurisdiction.  Congress intended to control where and how nuclear incident litigation is to take place, but did not take the next step of specifically divesting tribal courts of jurisdiction.  While the precise scope of retained tribal jurisdiction in this case is subject to reasonable debate, tribal adjudicatory authority over this nuclear incident is not "patently violative of an express jurisdictional prohibition."

## C

The tribal exhaustion requirement created by National Farmers is based on comity concerns for Indian tribes in maintaining their remaining sovereignty.  National Farmers recognizes that three specific interests are advanced by proper application of the rule: (1) furthering congressional policy of supporting tribal self-government; (2) promoting the orderly administration of justice by allowing a full record to be developed in the tribal court; and (3) obtaining the benefit of tribal expertise if further review becomes necessary.  National Farmers, 471 U.S.

---

[6](...continued)
extent to which state (or tribal) law may inform the issue of a nuclear tortfeasor's liability. Pursuant to the tribal exhaustion rule, this question should first be addressed in tribal court.

at 856-57. If, as in this case, none of the National Farmers exceptions is present, the court must then make an inquiry whether to abstain based on these concerns. So long as the policies behind the tribal exhaustion rule are served by its application, "comity requires the parties to exhaust their tribal remedies before presenting their dispute to the district court." Zah, 5 F.3d at 1378.

We have taken a strict view of the tribal exhaustion rule and have held that "federal courts should abstain when a suit sufficiently implicates Indian sovereignty or other important interests." Pittsburg & Midway Coal Mining Co. v. Watchman, 52 F.3d 1531, 1542 (10th Cir. 1995). As the Tribal Claimants correctly assert, this court at times abstains without making a detailed comity analysis, holding that "when the dispute is a 'reservation affair' there is no discretion not to defer." Zah, 5 F.3d at 1378 (citing Crawford v. Genuine Parts Co., 947 F.2d 1405, 1408 (9th Cir. 1991) (accident on the reservation involving tribal members "arises on the reservation" within meaning of National Farmers presumptive tribal jurisdiction)). When the activity at issue arises on the reservation, comity concerns "almost always dictate that the parties exhaust their tribal remedies before resorting to the federal forum." Id. Conversely, "[w]hen the dispute involves non-Indian activity occurring outside the reservation . . . the policies behind the tribal exhaustion rule are not so obviously served. Under these circumstances, we must depend on the district courts to examine assiduously

the National Farmers factors in determining whether comity requires the parties to exhaust their tribal remedies before presenting their dispute to the federal courts." Id.; United States v. Tsosie, 92 F.3d 1037, 1042-43 (10th Cir 1996) (same).

Here, the Tribal Claimants suggest that we need not even weigh the comity factors because of the nature of the underlying action. We agree that strong tribal interests are implicated by these claims. The mill that allegedly produced the toxic and radioactive waste was located on the reservation pursuant to a lease with the tribe, and the alleged victims of the tort are tribal members residing on the reservation. The tribal nexus is strong, as is the interest of the tribe as a sovereign in protecting and vindicating the rights of its residents, as well as its interest as lessor of the land for the mill. Yet, Kerr-McGee's argument that this is not a classic "reservation affair" has some force. Nuclear production is of national interest, the mill sold its entire production to the federal government, and the orderly administration of claims arising out of the United States' atomic energy and weapons program implicates concerns far beyond the borders of the reservation. While the district court appeared to consider the tort claims "a reservation affair" and therefore reviewed the comity factors only briefly, the unique concerns implicated in this case deserve a more thorough comity analysis.

In this case, the first factor most strongly supports abstention. If courts are to honor Congress's commitment to tribal self-government, tribal courts must be

allowed to exercise their authority over mass toxic tort claims occurring within their jurisdiction and alleging injury to tribal members, absent overwhelming countervailing concerns. Even Strate and Montana, cases that curtailed tribal authority over non-Indians, recognized that tribes retain a core sovereign interest in protecting the health and welfare of the tribe such that they may regulate non-Indians on all lands within the reservation. Strate, 117 S. Ct. at 1415; Montana, 450 U.S. at 566. This appears to be such a case.

The second factor, the orderly administration of justice, does not so obviously cut in favor of tribal exhaustion. The PAA, contemplating mass tort litigation arising from a nuclear incident, creates specific procedures to facilitate and consolidate adjudication of such claims. Though National Farmers recognizes that allowing tribal courts to make initial jurisdictional determinations minimizes a potential "procedural nightmare," it is not clear that such a justification holds here. Because of Iowa Mutual's expansive abstention, we are required to allow full exhaustion of tribal court litigation, potentially including litigation of the merits. Given Congress's authorization of specific procedures for dealing with these cases in federal court, abstaining in favor of the tribal court hardly seems to minimize the prospect of a "procedural nightmare."[7] It is

---

[7]Currently, there appears to be litigation involving Cyprus Foote's Uranium mines in at least two separate Navajo tribal courts, as well as in the federal courts of the Ninth and Tenth Circuits. See Farley v. Kerr-McGee, No. SR-CV-103-95 (Navajo D. Ct.,

(continued...)

- 24 -

difficult to balance the loss of specific procedures developed by the PAA for case consolidation and case management of cases such as these against the full record that will be developed in tribal courts by virtue of federal court abstention.

The third comity consideration, obtaining the benefit of tribal court expertise may be of value in this case. 42 U.S.C. § 2014(hh) requires that the substantive rules of decision in such actions are to be derived from the "law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section." At oral argument, counsel for the Tribal Claimants argued that the substantive rule of decision in this case should be derived from Navajo tribal law.

Upon reviewing the comity factors, we conclude that abstention is appropriate. Kerr-McGee contends that it is inappropriate to analyze the tribal court jurisdiction question and the comity factors separately. Specifically, it argues that our comity analysis must consider the strong role afforded federal courts in resolving Price-Anderson suits. We disagree. The National Farmers framework does not accord countervailing federal concerns a place in the comity

---

[7](...continued)
District of Shiprock); Richards v. Texas Zinc, KY-CV-002-95 (Navajo D. Ct., District of Kayenta); Kerr-McGee v. Farley, No. 95-438 (D. N.M.); El Paso Natural Gas v. Neztsosie, No. 96-49/ 96-1524 (D. Ariz.). The Price-Anderson Act has instituted procedures specifically designed to avoid this sort of atomized litigation and the "procedural nightmares" attendant to it.

analysis. Consideration of federal jurisdictional concerns is only appropriate in the context of determining whether to engage in the comity analysis at all.

It does not serve Congress's interest in promoting development of tribal courts, see Iowa Mutual, 480 U.S. at 19, to second-guess the jurisdictional determinations of the Navajo district court before the tribal appellate process has run its course. The district court's judgment is **AFFIRMED.**