The Honorable Becky Hutchins State Representative, 50th District 700 Wyoming Holton, Kansas 66436
Dear Representative Hutchins:
As State Representative for a district that encompasses a federally recognized Indian reservation, you request our opinion regarding tribal law enforcement powers. Specifically you inquire whether the Prairie Band Potawatomi tribal police may enforce tribal traffic ordinances against a non-member within the exterior boundary of the reservation 1) on the portion of U.S. Highway 75 that traverses the reservation; 2) on county roads; or 3) on roads maintained by the Tribe. Additionally you inquire whether traffic violations are considered civil or criminal and what impact that status has on the Tribe's ability to enforce traffic ordinances.
As background, you indicate that the Jackson County Sheriff has reported observing individuals being stopped by tribal police, presumably for traffic violations. You state that since tribal police do not have authority to issue traffic citations for state law violations, you assume the citations issued by the tribal police are for alleged violations of tribal ordinances, with any fines payable to the Prairie Band Potawatomi Tribe.
Under state law, traffic infractions are criminal violations. Tribes lack criminal jurisdiction over non-Indians;[1] a tribe cannot, for this reason, assert criminal jurisdiction over non-Indian traffic violators. Thus, notwithstanding a tribe's public safety concerns, when a non-Indian commits a crime within the boundaries of a reservation, tribal law enforcement officers may not serve criminal process on, arrest or prosecute that individual.[2] While some may argue that this lack of authority creates inconsistency and difficulties in enforcement, the United States Supreme Court has clearly drawn the lines of authority in criminal matters. Thus, to the extent a tribe's traffic infractions or offenses are criminal in nature, a tribe has no authority to enforce such ordinances or laws against non-Indians.
We are advised that the Potawatomi Tribe claims that it has classified its traffic laws as civil in nature and does not arrest or prosecute individuals criminally for violations of the traffic code. If this is the case, then we must determine whether the Tribe has authority to enforce civil/regulatory traffic provisions against non-tribal members on the reservation.
Although Indian tribes do not derive their sovereign powers from congressional delegation, Congress can, pursuant to its plenary power over Indians, restrict that power.[3] To the extent that sovereignty has not been withdrawn by federal statute or treaty, tribes retain some characteristics of sovereignty over their members and their territory.[4] Our analysis, thus, must include a perusal of relevant federal statutes, executive policy, treaties, and judicial decisions and an examination of tribal sovereignty and how it has been diminished, altered or divested.[5]
We find no federal statute which grants the Tribe regulatory authority to enforce tribal ordinances against non-tribal members. Neither the Treaty with the Potawatomi Nation of 1846, which deals with removal of the Potawatomi Nation to Kansas, nor the Treaty with the Potawatomi of 1861, provide or address tribal authority over non-tribal members. We turn now to an examination of a tribal agreement that concerns Highway 75.
Federal legislation transferred the original right-of-way over tribal trust land for the old highway 75 to the State of Kansas.[6] In 1991, the Tribal Council and the Kansas Department of Transportation[7] entered into an agreement that granted a right-of-way through the reservation for New Highway 75, widening the old U.S. Highway 75. In Sections 3 and 6.1 of the Highway 75 Agreement dated November 5, 1991, the Tribe released:
 "[A]ll right, title and interest it may have in and to the right-of-way for New Highway 75 and hereby waives, relinquishes and forgoes any claim it may have with respect thereto or with respect to the establishment and construction of Highway 75. . . . The Tribe agrees that the Secretary shall have exclusive authority as to all matters pertaining to the operation, maintenance and control of the New Highway within its right-of-way limits."
The language clearly indicates a relinquishment of any power and authority over the operation, maintenance and control of the highway. In Section 6.2 the agreement addresses tribal jurisdiction and states:
 "Notwithstanding any other provision of this agreement, the Tribe reserves to itself, pursuant to federal law, judicial
jurisdiction over matters arising from acts, events or omissions within the right-of-way limits of New Highway 75 as may otherwise be judicially determined in the Tribal Court. The Tribe agrees, however, that nothing in this Subsection shall be construed to confer upon or reserve to the Tribal Court jurisdiction over the Secretary or in rem jurisdiction over any part of New Highway 75. The Secretary recognizes the jurisdiction reserved by the Tribe in this Subsection. Neither by this recognition, nor by any other provision of this Agreement, however, does the Secretary in any manner submit to the jurisdiction of the Tribal Court." (Emphasis added.)
In the agreement, the Tribe relinquished any right to exercise control over the right-of-way and recognized the State's exclusive authority over the highway. The Tribe reserved judicial jurisdiction pursuant to federal law over matters arising from acts as may be determined by the tribal court. The reservation of judicial jurisdiction pursuant to federal law for purposes of adjudication in Section 6.2 is not relevant because our issue involves regulatory authority over non-members.
The leading case in the regulation of non-Indians on non-Indian owned land within a reservation is Montana v. UnitedStates,[8] wherein the Court holds that absent a showing that tribal interests are affected, a tribe lacks inherent power to regulate hunting and fishing by non-Indians on non-Indian land within the reservation. The Court identifies sources of power to regulate — federal statutes, treaty rights and inherent tribal sovereignty — and reasons that when the tribe lost the power to exclude non-tribal members from the reservation with the advent of allotment,[9] it lost the power to regulate those individuals.[10] With regard to tribal sovereignty, the Court states the general rule that a tribe's exercise of tribal power "beyond what is necessary to protect tribal self-government or to control internal relations" is inconsistent with its dependent status and thus cannot be exercised without express congressional delegation, with two exceptions. Under the exceptions, tribes retain inherent sovereign power 1) to regulate by licensing, taxation or other means, activities of non-members who enter consensual relationships with the Tribe or its members, as in commercial dealings; and 2) to regulate conduct of non-Indians that threatens or directly affects "the political integrity, the economic security, or the health and welfare"[11] of the tribe. Because our question does not involve a consensual relationship between the Tribe and non-members, we will focus on the second exception.
Subsequent cases governed by Montana evidence a narrow application of the second exception and are dispositive of or assist in our inquiry whether tribal police can enforce tribal traffic ordinances that are civil in nature on a state highway which traverses the reservation. Although stated as exceptions inMontana, the plurality opinion in Brendale v. Confederated Tribesand Bands of the Yakima Indian Nation[12] applies the "general principle" of Montana and holds that a tribe is precluded from zoning certain fee lands within parts of the reservation that are owned by non-Indians. The decision permitted the tribe to zone non-tribal member owned fee lands in the "closed" portion of the reservation, but found the tribe lacked authority to zone non-member owned fee lands in the "open" portion of the reservation. Giving consideration to the checkerboard ownership of the reservation land, Justice White adopted a more stringent standard for the second Montana exception, reasoning that the impact on tribal interests "must be demonstrably serious and must imperil the political integrity, the economic security, or the health and welfare of the tribe"[13] for the tribe to have regulatory zoning authority over the lands of non-Indians.
The second Montana exception is also applied in a case involving a state highway on a reservation. In Strate v. A-1Contractors,[14] the Supreme Court held that a tribal court lacks judicial jurisdiction over a civil suit between non-Indians arising out of a vehicle accident on a state highway traversing the reservation. Finding that the grant of right-of-way to the state precluded the tribe from exercising proprietary rights of exclusion and rendered the highway the equivalent of non-Indian fee land, the Court took a narrow view of the second Montana
exception by stating:
 "The second exception to Montana's general rule concerns conduct that `threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the Tribe.' 450 U.S. at 566. Undoubtedly, those who drive carelessly on a public highway running through a reservation endanger all in the vicinity, and surely jeopardize the safety of tribal members. But if Montana's second exception requires no more, the exception would severely shrink the [Montana] rule. Again, cases cited in Montana indicate the character of the tribal interest the Court envisioned."[15]
Although only adjudicatory authority was at issue,[16] the Court reasoned that "a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction"[17] and found that neither regulatory nor adjudicatory authority over the state highway accident is needed to preserve the "`right of reservation Indians to make their own laws and be ruled by them.' Williams,358 U.S., at 220, 79 S.Ct., at 271. The Montana rule, therefore, and not its exceptions, applies to this case."[18] [We note that the United States Supreme Court's decision in this case may affect the Tribe's reservation of judicial authority in the agreement discussed on page 3 of this opinion.]
Similarly, in Wilson v. Marchington,[19] the Ninth Circuit Court of Appeals found that a tribal court did not have jurisdiction over a personal injury action arising from an accident between a member of the Indian tribe and a non-member on a U.S. highway within the boundaries of an Indian reservation and thereby precluded a federal court from recognizing the tribal court judgment. The Court applied the second Montana exception and, quoting Brendale, once again found that the circumstances did not rise to the standard necessary to meet the second exception. The Court states:
 "If the possibility of injuring multiple tribal members does not satisfy the second Montana exception under Strate, then perforce, Wilson's status as a tribal member alone cannot. To invoke the second Montana exception, the impact must be `demonstrably serious and must imperil the political integrity, the economic security, or the health and welfare of the Tribe.' (citations omitted)."[20]
Unlike Montana and Brendale, regulatory authority is not directly at issue in Strate or in Marchington, but the cases apply theMontana analysis and are important examples of the of the Courts' consistent conclusion of what circumstances do not warrant or rise to the standard necessary to satisfy the second Montana exception.Strate and Marchington also reinforce the importance of access; whether the land was open to the public was a critical factor in both Montana and Brendale. Key to both Strate and Marchington are the questions of who has access and who controls the state highways at issue. Applying the analysis, we focus on these factors.
We find that the original right-of-way for the old U.S. Highway 75 was obtained pursuant to federal law. The Tribe consented to and received payment for the State's use of the right-of-way for the highway's widening, thus rendering the highway alienated non-Indian land. The right of way is open to the public, maintained by the State, and subject to the State's control; the Tribes' relinquishment of its right to occupy and exclude carries with it the loss of tribal regulatory jurisdiction over use of the land by the State.[21] In accordance with Strate, tribal regulatory authority against non-members on this highway is not necessary to preserve the Tribe's ability to make its own laws and be ruled by them. Additionally, state regulations are a sufficient deterrent for all who travel the highway to ensure that non-members will not violate state traffic laws with impunity and thereby endanger the public on this highway. Thus, the circumstances do not satisfy the second Montana exception.
In sum, in the absence of a federal statute or treaty authorizing the Tribe to govern the conduct of non-members on the highway in question, and because neither of the Montana exceptions apply, we must apply Montana's general rule and find that the Tribe has no regulatory authority over the conduct of non-members on Highway 75. It is our therefore our opinion that tribal police do not have the authority to enforce tribal ordinances that are civil in nature against a non-member on State Highway 75, including the portion that traverses the reservation.
Your second and third questions are whether tribal police may enforce tribal ordinances against non-members on county roads and on "tribally maintained roads." Case law generally contains language that tribes retain considerable control over non-member conduct on tribal land whenever a significant tribal interest is implicated.[22] However, in both Montana and Strate the land in question is alienated land. At issue in Montana is tribal authority over the conduct of a non-Indian on reservation land which is owned in fee by a non-Indian. In Strate, the U.S. Supreme Court finds that the State's acquisition of a right-of-way rendered the highway the equivalent to alienated, non-Indian land. In Marchington, the Ninth Circuit Court of Appeals follows Strate
and considers the effect of alienation, access and who maintains and controls the road in question.[23]
The facts we have been given do not indicate whether the roads at issue were constructed on alienated land or on trust lands. There is additionally no indication whether the roads in question are thoroughfares, or whether they are marked and controlled as a function of government, be it tribal or state government. Case law, even the fractured opinion in Brendale, clearly demonstrates, that the circumstances or facts must rise to the standard necessary to meet the second Montana exception. In other words, a significant tribal interest must be implicated by the circumstances. Without the necessary factual information, we are unable to determine whether enforcement of civil tribal traffic ordinances by tribal police against non-members on the county and tribal roads in question is permitted under the Montana analysis.
Your last question is whether traffic violations are civil or criminal and what, if any, impact that status has on the Tribe's ability to enforce tribal ordinances. As indicated previously, the Tribe claims it has enacted a traffic code that treats traffic infractions as civil in nature; under Kansas law, traffic infractions are crimes.[24]
In determining whether a law is criminal or civil, Courts consider not only the label but also look at the public policy and purpose of the legislation, what it actually does[25] and how it is implemented. We do not possess sufficient facts to determine whether the tribal traffic ordinances are being implemented as civil or criminal. The ordinances, if truly civil in nature, can be enforced against non-tribal members only with attendant civil procedures and penalties, and only on roads (if any) that meet theMontana exception. If the Tribe's traffic ordinances are criminal violations with attendant criminal penalties, the Tribe has no authority to enforce these criminal laws against non-Indians on the reservation, as we indicated in our response to your first question.
Very truly yours,
 CARLA J. STOVALL Attorney General of Kansas
 Guen Easley Assistant Attorney General
CJS:JLM:GE:jm
[1] Oliphant v. Suquamish Indian Tribe, 435 U.S. 191,98 S.Ct. 1011, 55 L.Ed.2d 209 (1978).
[2] See generally, State v. Levier, 226 Kan. 461 (1979);Kaul v. Stephan, 83 F.3d 1208 (10th Cir. 1996).
[3] United States v. Wheeler, 435 U.S. 313, 323,98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978).
[4] N.L.R.B. v. Pueblo of San Juan, 30 F. Supp.2d 1348
(D.N.M. 1998); Kerr-McGee v. Farley, 915 F. Supp. 273, 277, (D.N.M. 1995) aff'd, 115 F.3d 1498 (10th Cir. 1997) (citing IowaMutual Ins. Co. v. LaPlante, 480 U.S. 9, 107 S.Ct. 971,94 L.Ed.2d 10 (1987).
[5] National Farmers Union Insurance Companies v. Crow Tribeof Indians, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985).
[6] See 25 U.S.C. § 311 (public highways); Correspondence dated February 5, 1959 from the U.S. Department of Interior approving the highway right-of-way over two tracts of Indian land.
[7] See Constitution and Bylaws of the Prairie Band of Potawatomi Indians, Art. V, Sec. 1(a) and (c) and K.S.A. 75-5023.
[8] 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981).
[9] Indian General Allotment Act of 1887, 24 Stat. 388
(1887); 25 U.S.C. § 331.
[10] Montana, 450 U.S. at 558-59; 101 S.Ct. at 1255.
[11] Ibid., 450 U.S. at 565-66.
[12] 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989).
[13] Brendale, 492 U.S. at 410; 109 S.Ct. at 2997; see LowerBrule Sioux Tribe v. State of South Dakota, 917 F. Supp. 1434,1445 (D.S.D. 1996) (for a discussion on the more stringent standard).
[14] 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997).
[15] Strate, 520 U.S. at 458; 117 S.Ct. at 1415.
[16] 520 U.S. at 442; 117 S.Ct. at 1407.
[17] 520 U.S. at 453, 117 S.Ct. at 1413.
[18] 520 U.S. at 459, 117 S.Ct. at 1416.
[19] 127 F.3d 805 (9th Cir. 1997), cert. den. ___ U.S. ___,118 S.Ct. 1516, 140 L.Ed.2d 669 (1998).
[20] 492 U.S. at 431; 109 S.Ct. at 3008.
[21] South Dakota v. Bourland, 508 U.S. 679, 689,113 S.Ct. 2309, 2316; see generally In Re Haines, 233 B.R. 480 (Bkrtcy. D.Mont. 1999).
[22] Cohen, F., Federal Indian Law, 253-254 (1982); N.L.R.B.v. Pachlo of San Juan, 30 F. Supp.2d 1348, 1352 (D.N.M. 1998); Spaeth, N., American Indian Law Deskbook 104 (1993).
[23] Strate, 520 U.S. at 454-455, 117 S.Ct. at 1413-1414;Marchington, 127 F.3d at 813-814.
[24] K.S.A. 1998 Supp. 21-3105; see State v. Kraushaar,264 Kan. 667 (1998).
[25] See Conferdated Tribes of the Colville Reservation v.State of Washington, 938 F.2d 146 (1991) (state lacked jurisdiction over reservation speeding violation by tribal member because state traffic infractions were civil not criminal violations) but cf. St. Germaine v. Circuit Court, 938 F.2d 75
(7th Cir. 1991) (state has jurisdiction over a tribal member to enforce prohibition against driving with revoked license).