Raymond J. DONOVAN, Secretary of Labor, Petitioner,

v.

NAVAJO FOREST PRODUCTS INDUS-TRIES and Occupational Safety and Health Review Commission, Respondents.

No. 80–2251.

United States Court of Appeals, Tenth Circuit.

Nov. 8, 1982.

Allen H. Feldman, Counsel for Appellate Litigation, U.S. Dept. of Labor, Washington, D.C. (James E. White, Regional Sol., T. Timothy Ryan, Jr., Acting Sol. of Labor,

Benjamin W. Mintz, Associate Sol. of Labor, and Mark J. Lerner, Atty., with him on the brief), for petitioner.

Jan T. Chilton, San Francisco, Cal. (Kurt W. Melchior, San Francisco, Cal., with him on the brief), of Severson, Werson, Berke & Melchior, San Francisco, Cal. (George J. Ahlmann and L. Lanning Sigler of Ahlmann & Sigler, Navajo, N.M., with him on the brief), for respondent Navajo Forest Products Industries.

Before BARRETT, McKAY and SEYMOUR, Circuit Judges.

BARRETT, Circuit Judge.

We are called upon in this appeal to decide whether the Congress intended the Occupational Safety and Health Act of 1970 (OSHA) to apply to the Indian tribal business enterprise known as Navajo Forest Products Industries (NFPI) which is owned and operated by the Navajo Tribe on the Navajo Reservation. The Secretary of Labor seeks review of the decision of the Occupational Safety and Health Commission (Commission) which adopted the findings/conclusions of the administrative law judge (ALJ) that Congress did not intend OSHA to apply in this case. Our jurisdiction vests pursuant to 29 U.S.C.A. § 660(b).

NFPI is the oldest of a number of business enterprises formed, owned and operated by the Navajo Tribe located on the Navajo Reservation in Navajo, New Mexico. NFPI is an arm or instrumentality of the Tribal government. The enterprise is engaged in the business of manufacturing wood products, including logging operations and the operation of a sawmill, molding plant, etc. NFPI conducts day-to-day operations which are supervised by its general manager who, in turn, is appointed and responsible to a nine-member management board. The board is appointed by the Navajo Tribe's advisory committee which is ultimately responsible for the operations of the business enterprise. The committee is part of the Navajo Tribal Council, the Tribe's legislative body. The 74-member Tribal Council is elected by popular vote. NFPI has employees who handle products which move between points both outside of and within the State of New Mexico.

NFPI is wholly owned and operated by the Navajo Tribe. Its primary purposes are to expand the enterprise into a fully integrated timber conversion facility, provide employment for the Navajo people, provide additional income to the Tribe and generally promote the advancement of social, economic and educational goals for the Navajos. The enterprise has been in existence for twenty years. Today the enterprise employs 650 workers, of whom only 25 are non-Indians. Through June of 1977, NFPI's net sales amounted to $97.6 million and its aggregate net profits amounted to $11.5 million. It paid Navajos $34.4 million in wages. The Tribe realized $17.3 million in stumpage fees, and returned $2.7 million of the Tribe's capital contributions.

The Secretary's compliance officers inspected NFPI's facilities in May and October, 1976, and, based thereon, the Secretary issued a citation to NFPI, charging one serious and 53 other-than-serious violations. The Secretary proposed a penalty of $4,040.00. NFPI contested the citation, asserting, among other grounds, that the Secretary lacked jurisdiction over an Indian tribal enterprise conducted and carried on on the tribal reservation. The ALJ found, following full hearing, that OSHA did not apply to NFPI. He ordered that the citation and proposed penalties be vacated. On the Secretary of Labor's petition, the ALJ's decision was reviewed by the Occupational Safety and Health Review Commission, pursuant to 29 U.S.C.A. § 659(c). Both the ALJ and the Commission found/concluded, notwithstanding the Secretary's strong reliance on *Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960), that OSHA did not apply to NFPI because there exists no legislative intent in OSHA or its legislative history to abrogate the treaty entered into between the United States Government and the Navajo Indian Tribe; thus, to apply OSHA to NFPI would violate the Navajo Treaty. We agree.

## I.

The Secretary contends that the Commission erred in finding that although NFPI meets OSHA's literal definition of "employer" because it is engaged in a business affecting commerce, that it is nonetheless not subject to OSHA based on the right of sovereignty reserved to the Navajo Tribe by the treaty and the absence of any indication that Congress intended Section 8(a)(1) of the Act to override treaty rights.

Section 8(a)(1), 29 U.S.C.A. § 657(a)(1) provides:

(a) In order to carry out the purposes of this chapter, the Secretary, upon presenting appropriate credentials to the owner, operator, or agent in charge, is authorized (1) to enter without delay and at reasonable times any factory, plant, establishment, construction site, or other area, workplace or environment where work is performed by an employee of an employer.

Article II of the treaty between the United States of America and the Navajo Tribe of Indians, dated June 1, 1868, 15 Stat. 667, states as follows:

[T]he United States agrees that no persons except those herein so authorized to do, and except such officers, soldiers, agents and employees of the government, or of the Indians, as may be authorized to enter upon Indian reservations in discharge of duties imposed by law, or the orders of the President, shall ever be permitted to pass over, settle upon, or reside in, the territory described in this article.

NFPI contends that the only federal employees permitted by this provision to enter the reservation are those "authorized by law to enter upon Indian reservations in discharge of duties imposed by law", and that the history and purpose of the inclusion of this language demonstrates that the only federal personnel authorized to enter the reservation are those *specifically* so authorized to deal with Indian affairs. The Secretary's counter contention is that the application of Article II as an exclusion in this case is unwarranted "as a matter of law and policy because: (1) NFPI is an employer within the literal meaning of the Act; (2) Federal laws of general application apply to Indians, according to *Tuscarora, supra;* (3) there is no reason to apply any exception to *Tuscarora* based upon the treaty since application of the Act to NFPI would not interfere with the Tribe's treaty rights; and (4) assuming *arguendo* that application of the OSH Act to NFPI would be inconsistent with the Navajo Treaty, the comprehensive OSH Act abrogates, or modifies, the treaty." [Opening Brief for Secretary, p. 11].

As to the Secretary's first contention, i.e., that NFPI is an "employer" within the literal meaning of OSHA, the parties agree that such is the case. We move next to the Secretary's reliance on *Federal Power Commission v. Tuscarora Indian Nation, supra.*

The Secretary contends that *Tuscarora* is one of a long line of cases in which general federal statutes have been applied to Indians. The Secretary relies on this language in *Tuscarora:* "it is now well settled by many decisions of this Court that a general statute in terms applying to all persons includes Indians and their property interests." 362 U.S. at p. 116, 80 S.Ct. at p. 553. The Court, in *Tuscarora,* applied this rule in upholding the taking of tribal lands by the New York State Power Authority pursuant to the federal statutory scheme applicable to the Federal Power Commission, which, like OSHA, applied generally. *Tuscarora* did not, however, involve an Indian treaty. Therein lies the distinguishing feature between the case at bar and the *Tuscarora* line of cases, which stand for the rule that under statutes of general application Indians are treated as any other person, unless Congress expressly excepts them therefrom. *Tuscarora,* 362 U.S. at pp. 115–18, 80 S.Ct. at pp. 552–54. The *Tuscarora* rule does not apply to Indians if the application of the general statute would be in derogation of the Indians' treaty rights. This was the basic "anchor" of the Commission's ruling in the instant case, with which we agree.

The Navajo treaty language set forth in Article II makes it clear, in our view, that

in order to achieve an end to conflict and ensure peace, the United States Government agreed to leave the Navajos alone on their reservation to conduct their own affairs with a minimum of interference from non-Indians, and then only by those *expressly* authorized to enter upon the reservation. That, in our view, is the plain, unambiguous meaning of the Navajo treaty language contained in Article II, *supra.*

■ Indian treaties have not been interpreted narrowly. They have been construed so as to recognize generously the full obligation of the United States to protect the interests of a dependent people. *Peoria Tribe of Indians of Oklahoma, et al. v. United States,* 390 U.S. 468, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968). All doubtful expressions contained in Indian treaties should be resolved in the Indians' favor. *Choctaw Nation, et al. v. Oklahoma, et al.,* 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970). And, absent explicit statutory language otherwise, the courts have almost universally refused to find congressional abrogation of treaty rights. *Washington, et al. v. Washington State Commercial Passenger Fishing Vessel Ass'n., et al.,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). The two primary sources of explicit limitations on tribal sovereignty or political independence are treaties and federal legislation dealing with Indians; the Indian tribes thus retain all aspects of tribal sovereignty not specifically withdrawn. *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978).

■ The Navajo Treaty recognizes the Indian sovereignty of the Navajos and their right of self-government. We agree with the Commission that the application of OSHA to NFPI would constitute abrogation of Article II of the Navajo Treaty relating to the exclusion of non-Indians not authorized to enter upon the Navajo Reservation. Furthermore, it would dilute the principles of tribal sovereignty and self-government recognized in the treaty. The Navajos have not voluntarily relinquished the power granted under Article II of the treaty. Neither has that power been divested by congressional enactment of OSHA; to so imply would be to dilute the recognized "attributes of [Indian tribal] sovereignty over both their members and their territory," *United States v. Mazurie, et al.,* 419 U.S. 544, 557, 95 S.Ct. 710, 717, 42 L.Ed.2d 706 (1975), and the retained powers of self-government not divested by Congress, relinquished by treaty or held to be inconsistent with a superior interest of the United States. *Oliphant v. Suquamish Indian Tribe, et al.,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978).

■ Limitations on tribal self-government cannot be implied from a treaty or statute; they must be expressly stated or otherwise made clear from surrounding circumstances and legislative history. *Bryan v. Itasca County, Minnesota,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); *Morton, Secretary of the Interior, et al. v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). Our review of the legislative history of OSHA does not support the Secretary's contention that nothing in the Navajo Treaty or principles of Indian sovereignty and self-government bar the application of OSHA to NFPI..

## II.

The breadth and scope of the power of Indian tribes to exclude non-Indians from territory reserved for the tribe was spelled out definitively by the Supreme Court in the case of *Merrion, et al. DBA Merrion & Bayless, et al. v. Jicarilla Apache Tribe, et al.,* 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982). The Court observed that *an Indian tribe's power to exclude non-Indians from tribal lands is an inherent attribute of tribal sovereignty, essential to a tribe's exercise of self-government and territorial management.* 455 U.S. at p. 141, 102 S.Ct. at p. 903. Significantly, the Court did not limit this power to those cases where the Indian Reservation is occupied under exclusionary language similar to that contained in Article II of the Navajo Treaty. In fact, *Merrion* dealt with an Indian Reservation created by executive order which simply set apart the reservation lands "for

the use and occupation of the Jicarilla Apache Indians". 455 U.S. at p. 134 n. 3, 102 S.Ct. at p. 900 n. 3 (Stevens, J., dissenting). Thus, it contained no express language similar to that contained in Article II of the Navajo Treaty restricting entry upon the reservation lands to only those non-Indians "*authorized* to enter upon Indian reservations in discharge of duties imposed by law, or the *orders* of the President ...." [Emphasis supplied]. The Jicarilla Treaty had never been entered into by the United States and the Congress did not enact special legislation relating to the Jicarilla Apache Tribe.

The *Merrion* Court recognized, of course, that the federal government, by congressional action, may apply constraints upon or even take away the inherent power of Indian tribes to exclude non-Indians from reservation lands. Both the majority opinion and the dissent in *Merrion* agreed that Indian tribes, as an attribute of their sovereignty, have the inherent power to exclude non-Indians from tribal lands. The majority opinion, in part, states that "the dissent correctly notes that a hallmark of Indian sovereignty is the power to exclude non-Indians from Indian lands, and that this power provides a basis for tribal authority to tax." 455 U.S. at p. 141, 102 S.Ct. at p. 904. The majority, in footnote 12, favorably endorsed the following interpretation set forth in the United States Solicitor for the Department of the Interior's revision of F. Cohen's Handbook of Federal Indian Law entitled Federal Indian Law 438 as "the present state of the law", to wit:

"Over tribal lands, *the tribe has the rights of a landowner as well as the rights of a local government, dominion as well as sovereignty.* But over all the lands of the reservation, whether owned by the tribe, by members thereof, or by outsiders, the tribe has the sovereign power of determining the conditions upon which persons shall be permitted to enter its domain, to reside therein, and to do business, provided only such determination is consistent with applicable Federal laws and does not infringe any vested rights of persons now occupying reservation lands under lawful authority."

455 U.S. at p. 146 n. 12, 102 S.Ct. at p. 906 n. 12. [Emphasis supplied in *Merrion*].

The dissenting justices in *Merrion* observed:

Incident to this basic power to exclude, the tribes exercise limited powers of governance over nonmembers, though those nonmembers have no voice in tribal government. Since a tribe may exclude nonmembers entirely from tribal territory, the tribe necessarily may impose conditions on a right of entry granted to a nonmember to do business on the reservation.

455 U.S. at p. 159, 102 S.Ct. at p. 913. (Stevens, J., dissenting).

Thus *Merrion,* in our view, limits or, by implication, overrules *Tuscarora, supra,* at least to the extent of the broad language relied upon by the Secretary contained in *Tuscarora* that "it is now well settled by many decisions of this Court that a general statute in terms applying to all persons includes Indians and their property interests." 362 U.S. at p. 116, 80 S.Ct. at p. 553.

The majority opinion in *Merrion* cited *Washington, et al. v. Confederated Tribes of the Colville Indian Reservation, et al.,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980) for the footnote observation that "Federal limitations on tribal sovereignty can also occur when the exercise of tribal sovereignty would be inconsistent with overriding national interests." 447 U.S. at p. 147 n. 13, 102 S.Ct. at p. 907 n. 13. *Colville* identified those "overriding national interests" as follows:

This Court has found such a divestiture [of tribal powers] in cases where the exercise of tribal sovereignty would be inconsistent with the overriding interests of the National Government, as when the tribes seek to engage in foreign relations, alienate their lands to non-Indians without federal consent, or prosecute non-Indians in tribal courts which do not accord the full protections of the Bill of Rights. 447 U.S. at pp. 153, 154, 100 S.Ct. at pp. 2081, 2082.

There has been no such overriding interest of the National Government advanced in the case at bar which would justify the application of OSHA to NFPI.

■ The United States retains legislative plenary power to divest Indian tribes of any attributes of sovereignty. *Lone Wolf v. Hitchcock*, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903). Absent some expression of such legislative intent, however, we shall not permit divestiture of the tribal power to manage reservation lands so as to exclude non-Indians from entering thereon merely on the predicate that federal statutes of general application apply to Indians just as they do to all other persons (in this case "employers") unless Indians are expressly excepted therefrom. We believe that *Merrion, supra,* settled that issue in favor of the tribes.

WE AFFIRM the Commission's decision.