280 F.3d 1278
 NATIONAL LABOR RELATIONS BOARD, Plaintiff-Appellant, and
Local Union No. 1385, Western Council of Industrial Workers, Intervenor-Appellant,
v.
PUEBLO OF SAN JUAN, Defendant-Appellee.
National Right to Work Legal Defense Foundation, Amicus Curiae.
 No. 99-2011.
 No. 99-2030.
 United States Court of Appeals, Tenth Circuit.
 September 26, 2000.
 
 1
 Nancy E. Kessler Platt of National Labor Relations Board, Washington, D.C. (Frederick L. Feinstein, Linda Sher, Margery E. Lieber and Eric G. Moskowitz with her on the brief) for Plaintiff-Appellant.
 
 
 2
 Michael T. Garone of Jolles, Bernstein & Garone, Portland, Oregon (Morton S. Simon of Simon, Oppenheimer & Ortiz, Santa Fe, New Mexico, with him on the brief) for Intervenor-Appellant.
 
 
 3
 Lee Bergen (Wayne H. Bladh, Daniel I.S.J. Rey-Bear, Thomas J. Peckham, with him on the brief) of Nordhaus, Haltom, Taylor, Taradash & Frye, Albuquerque, New Mexico for Defendant-Appellee.
 
 
 4
 Mickey D. Barnett, Law Offices of Mickey D. Barnett, P.A., Albuquerque, New Mexico and John C. Scully, Springfield, Virginia, filed an amicus curiae brief for the National Right to Work Foundation.
 
 
 5
 Before MURPHY and HOLLOWAY, Circuit Judges, and COOK, District Judge.*
 
 
 6
 COOK, District Judge.
 
 
 7
 In this case we are called upon to decide whether the Pueblo of San Juan ("Pueblo"), a federally recognized Indian tribal government, has the authority to enact and enforce a right-to-work tribal ordinance prohibiting union security agreements for companies engaged in commercial activity on tribal lands. The National Labor Relations Board ("NLRB") and Local Union No. 1385, Western Council of Industrial Workers ("Union") seek review of the order entered by the district court which granted summary judgment in favor of the Pueblo. The district court upheld the Pueblo's right-to-work ordinance as a valid exercise of the Pueblo's sovereign governmental authority over commercial activity on tribal lands in light of the statute's provision which permits state and territorial governments to regulate union security agreements. On appeal, the NLRB and the Union claim that the Pueblo's enactment of the right-to-work ordinance and the inclusion of the provision within a lease, violates the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 to 169.
 
 I. Background
 
 8
 The relevant and material facts are undisputed. As a federally recognized Indian tribal government, the Pueblo is governed by a tribal council, which is vested with legislative authority over tribal lands. The Pueblo has 5,200 members, most of whom live on tribal lands that are held in trust by the United States for the Pueblo. Through federally-approved leases, the Pueblo rents certain portions of its tribal land to a non-tribal business as a source of generating tribal income and as a means of employment for tribal members.
 
 
 9
 For 27 years prior to August 1996, Duke City Lumber Company ("Duke City") owned and operated a sawmill on the Pueblo Indian Reservation. Duke City leased the land used for its operations from the Pueblo pursuant to a lease approved by the Department of the Interior. Duke City operated under a collective bargaining agreement with the Union which contained a union security clause that required all bargaining unit employees to become and remain members of the union and pay union dues. For 27 years the Pueblo did not object to the collective bargaining agreement.
 
 
 10
 On August 21, 1996, Duke City sold the sawmill and related assets to Idaho Timber Company for use by Idaho Timber's subsidiary, Rio Grande Forest Products Industry ("Rio Grande"). The Pueblo agreed to release Duke City from its obligation under the lease in exchange for a commitment by Idaho Timber to enter into a new lease. The Department of the Interior approved this arrangement. The Pueblo and Idaho Timber negotiated a new lease containing a preferential employment hiring provision for Pueblo members and a provision forbidding Rio Grande from entering into a collective bargaining agreement requiring Pueblo employees to become union members before they could obtain the benefits of the employment preference.[1] The Department of the Interior approved the lease.[2] Rio Grande hired approximately 80 employees, 28 of whom are Pueblo members. After the lease was executed, the Union demanded that Rio Grande enter into a collective bargaining agreement with it as the exclusive bargaining agent for employees. Rio Grande was unwilling to recognize the Union.
 
 
 11
 On November 6, 1996, in response to the Union filing an unfair labor practice charge with the NLRB, the tribal council enacted Labor Organization Ordinance No. 96-63 ("ordinance").[3] The ordinance expanded the scope of the lease provision by affording to all employees on tribal lands the freedom of choice regarding union membership, not just employees who are Pueblo members. The Pueblo's right-to-work ordinance relates only to compulsory membership; it does not prohibit employees from voluntarily joining a union or from voluntarily organizing or participating in union activities on tribal lands. To settle the unfair practice charge, the Union and Rio Grande entered into a collective bargaining agreement, but conditioned its effectiveness on a federal court determining the validity of its right-to-work ordinance.
 
 
 12
 The NLRB filed the action below seeking declaratory and injunctive relief, and the Union intervened. The NLRB and the Union separately appealed summary judgment rendered in favor of the Pueblo. The appeals were consolidated. On appeal the Pueblo asserts that the ordinance is a valid exercise of its inherent right to self-government. The NLRB and the Union argue that the NLRA preempts tribal law.
 
 
 13
 The district court found that the text of the NLRA and the legislative history of the statute did not mention or discuss Indian tribes. NLRB v. Pueblo of San Juan, 30 F.Supp.2d 1348, 1353 (D.N.M. 1998) (citing Sac & Fox Indus. Ltd., 307 N.L.R.B. 241, 243, 1992 WL 90688 (1992)). The district court relied on Supreme Court precedent which demonstrates that tribal sovereign authority may be abridged only by a clear indication to that effect in the language or legislative history of a statute, or by federal preemption of the entire subject area. Mere silence regarding Indian tribes is insufficient to establish an abrogation of traditional sovereign authority. Pueblo of San Juan, 30 F.Supp.2d at 1351 (citing Iowa Mutual Ins. v. LaPlante, 480 U.S. 9, 17-18, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987)).
 
 
 14
 The district court also relied on Supreme Court authority that federal law does not preempt regulation of contracts which require union membership as a condition of employment. Id. at 1352 (citing Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Bd., 336 U.S. 301, 307, 69 S.Ct. 584, 93 L.Ed. 691 (1949)). The district court rationalized that tribes are not the equivalent of states or territories and are nothing akin to municipal government, which derive all of their authority from the states. Id. at 1353 (citing Kerr-McGee v. Farley, 915 F.Supp. 273, 276 (D.N.M.1995) aff'd. 115 F.3d 1498 (10th Cir.1997)). The lower court determined Indian tribes and the federal government are dual sovereigns and occupy a unique status under the law, Id. (citing National Union Ins. Cos., Lodge Grass School Dist. No. 27 v. Crow Tribe, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985)), and because of this unique relationship, Indian tribal sovereignty cannot be abrogated as easily. Id.
 
 
 15
 The lower court stated that section 14(b) of the NLRA demonstrates that Congress did not intend for federal policy to be exclusive or uniform in the area of union security agreements and that any ambiguities in federal law should be construed to comport with the federal policy of encouraging tribal independence. Id. at 1355 (citing White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143-44, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980)). The district court concluded by holding:
 
 
 16
 Given the explicit Congressional statement in § 14(b) that federal policy shall not be exclusive in this area, Supreme Court holdings that federal law does not preempt state regulation of contracts requiring union membership, and Congressional silence as to the status of Indian tribes under the NLRA, this Court concludes that tribes retain the authority to enact laws which prohibit requiring union membership as a condition of employment.
 
 
 17
 Pueblo of San Juan, 30 F.Supp.2d at 1355. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.
 
 II. Standard of Review
 
 18
 We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court under Fed.R.Civ.P. 56(c). Utah v. Babbitt, 53 F.3d 1145, 1148 (10th Cir. 1995). Under this standard, summary judgment is appropriate when the evidence taken as a whole, "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The parties have stipulated to the material facts, therefore we need only determine whether the district court correctly applied the substantive law. The issue before us arising under the NLRA apparently is a matter of first impression in any court. We review de novo the district court's interpretation of the federal statute.
 
 III. Discussion
 
 19
 The issue in this case is whether the NLRA preempts an Indian tribe from adopting a right-to-work ordinance applicable to employees of a non-Tribal company engaged in business activities on a reservation.
 
 
 20
 Appellants argue section 8(a)(3) of the NLRA, within 29 U.S.C. § 158(a)(3) protects the right of a union and employer to enter into a union security agreement except for the limitation of section 14(b), within 29 U.S.C. § 164(b), which allows only states and territories to prohibit the otherwise allowable union shop provisions.
 
 Section 8(a)(3) provides:
 
 21
 Nothing in this subchapter or in any other statute of the United States shall preclude an employer from making an agreement with a labor organization ... to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whatever is later.
 
 
 22
 49 Stat. 452 (1935), as amended, 29 U.S.C. § 158(a)(3) (1952).
 
 
 23
 Section 14(b) within 29 U.S.C. § 164(b) modifies section 8(a)(3) and provides:
 
 
 24
 Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.
 
 
 25
 Appellants argue that section 14(b) is limited to states or territories, and does not include Indian tribes. The legislative history of the Taft-Hartley Act is silent as to whether its provisions are applicable to Indian tribal governments. The Supreme Court considered the legislative history of section 14(b) in regards to state sovereignty in Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Bd., 336 U.S. 301, 69 S.Ct. 584, 93 L.Ed. 691 (1949) and concluded (1) that the Wagner Act was never intended to affect state law provisions concerning the legality of the closed and union shop and (2) that section 14(b) was added by the Taft-Hartley Act "to forestall the inference that federal policy was to be exclusive." Id. at 314, 69 S.Ct. 584.
 
 
 26
 The Supreme Court revisited the legislative history of section 14(b) in Retail Clerks Int'l Ass'n Local 1625 v. Schermerhorn, 375 U.S. 96, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963) (Schermerhorn I).[4] Section 14(b) was passed to codify in federal law the right of states to prevent union security agreements in those states where such arrangements were contrary to state policy. In Schermerhorn I, the Supreme Court construed section 14(b) as not only allowing states the right to bar the execution but also the power to enforce the states' right-to-work laws. The court reasoned "[w]here Congress gives state policy that degree of overriding authority, we are reluctant to conclude that it is nonetheless enforceable by the federal agency in Washington." Id. at 103, 84 S.Ct. 219. Section 14(b) therefore constitutes an express congressional exemption from the view that the NLRA preempts the entire field of labor law.
 
 
 27
 Appellants rely on Federal Power Comm'n v. Tuscarora Indian Nation, 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960) for the proposition that the NLRA, as a statute of general application, applies to all persons including Indian tribes. In Tuscarora the court stated "it is now well settled by many decisions of this Court that a general statute in terms applying to all persons includes Indians and their property interests." Id. at 116, 80 S.Ct. 543. This argument fails because the NLRA by its terms is not a statute of general application, it excludes states and territories. Congress in passing section 14(b) expressly retained the sovereign rights of states and territories to prohibit such agreements. Where Congress has provided for the retention of sovereign rights, by implication this right would extend to all sovereignties which are part of the United States.
 
 
 28
 In Donovan v. Navajo Forest Products Industries, 692 F.2d 709 (10th Cir.1982) we addressed tribal sovereignty in view of the broad language in Tuscarora. We stated, "The two primary sources of explicit limitations on tribal sovereignty or political independence are treaties and federal legislation dealing with Indians; the Indian tribes thus retain all aspects of tribal sovereignty not specifically withdrawn." Id. at 712, emphasis added, (citing United States v. Wheeler, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978)). We opined that the case of Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) limits or, by implication, overrules Tuscarora by the Supreme Court's observation in Merrion "that an Indian tribe's power to exclude non-Indians from tribal lands is an inherent attribute of tribal sovereignty, essential to a tribe's exercise of self-government and territorial management." See id. at 712 (citing Merrion, 455 U.S. at 141, 102 S.Ct. 894). We conclude, the holding in Tuscarora does not require the application of section 8(a)(3) of the NLRA to Indian tribes.
 
 
 29
 Appellants next argue that tribal sovereignty has been limited in this area through the enactment of the NLRA by the failure of Congress to include Indian tribes within the language of section 14(b). Application of federal statutes to Indian tribes must be viewed in light of the federal policies which promote tribal self-government, self-sufficiency, and economic development. Tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians engaged in commercial activities on Indian land. See Montana v. United States, 450 U.S. 544, 565, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). The district court recognized the inherent sovereign authority of Indian tribes over non-Indian commercial activities occurring on a reservation. This interpretation is consistent with existing precedent in this circuit regarding the inherent nature of tribe's sovereign status as governmental entities.
 
 
 30
 Only two federal employment and labor relations statutes expressly exclude tribes from their coverage: Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e to 2000e-17 and Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101-213. All other federal statutes regulating employment and labor relations are silent as to their application to Indian tribes. In view of Congress' silence, courts must address the issue of whether these statutes apply to Indian tribes. This circuit has generally recognized a tribe's sovereign right to regulate internal economic matters unless a federal regulatory scheme abrogates that right or the federal regulation preempts the entire subject it covers.
 
 
 31
 In Donovan, we found that a treaty containing a general right of exclusion barred application of the Occupational Safety and Health Act (OSHA) to a business which was owned and operated by the Navajo Tribe on the Navajo reservation because (1) its enforcement would violate the treaty's provision which recognized the tribe's right to exclude non-Indians from tribal lands and (2) it would dilute the principles of tribal sovereignty and self-government recognized in the treaty. We stated, "Limitations on tribal self-government cannot be implied from a treaty or statute; they must be expressly stated or otherwise made clear from surrounding circumstances and legislative history." 692 F.2d at 712 (citing Bryan v. Itasca County, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); and Morton v. Mancari, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)).
 
 
 32
 In EEOC v. Cherokee Nation, 871 F.2d 937 (10th Cir.1989) we determined that the Age Discrimination in Employment Act (ADEA) did not apply to Indian tribes because its enforcement would directly interfere with the Cherokee Nation's treaty-protected right of self-government. In that case we stated. "Like the Supreme Court, we have been, `extremely reluctant to find congressional abrogation of treaty rights' absent explicit statutory language." 871 F.2d at 938.
 
 
 33
 In Wardle v. Ute Indian Tribe, 623 F.2d 670 (10th Cir.1980), we affirmed the dismissal of civil rights claims brought against the tribe under 42 U.S.C. § 1981. We held that the specific provisions of Title VII, prohibiting discrimination in employment and excluding Indian tribes from its coverage, controlled over the general provisions of § 1981 and precluded the cause of action against the tribe. 623 F.2d at 672.
 
 
 34
 However, in Phillips Petroleum v. EPA, 803 F.2d 545 (10th Cir.1986) we held that the Safe Drinking Water Act (SDWA) regulated by the Environmental Protection Agency was applicable to Indians because the Act expressly included Indian tribes in the 1986 amendments to the SDWA. We also found that the EPA had jurisdiction over Indian land in that the underground drinking water provisions of the SDWA applied throughout the country establishing a national policy with respect to clean water, including sources of underground water. 803 F.2d at 555.
 
 
 35
 The exclusion of Indian tribes from the employment discrimination statutes illustrates congressional intent not to interfere in employee-management disputes on reservations.[5] In EEOC v. Cherokee Nation, we considered the ADEA which is silent as to tribes, and Title VII which excludes tribes, and concluded that the close relationship of these statutes indicates that Congress did not intend for the ADEA to apply to tribes, absent express statutory inclusion. 871 F.2d at 938-39. As in Donovan, we have been reluctant to apply statutes which regulate the terms and conditions of employment such as health and safety in the workplace (OSHA), unless the statute expressly includes Indian tribes as we determined in Phillips Petroleum v. EPA, 803 F.2d at 554.
 
 
 36
 At issue in this case is a property lease entered into between the Pueblo and a private company. The terms of the lease were approved by a federal regulatory agency. In Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), the Supreme Court determined the extent of tribal legislative authority over non-Indians and their property located within a reservation. In that case, the central issue was whether the Crow Tribe of Montana could regulate duck hunting and trout fishing by non-Indians within the reservation. The Supreme Court held that the tribe had the authority to regulate hunting and fishing by non-Indians on tribal lands but that it did not have the authority to regulate hunting and fishing on fee patented land within the reservation. Montana v. United States, 450 U.S. at 565-66, 101 S.Ct. 1245. The Supreme Court explained that the inherent powers of an Indian tribe do not extend to the activities of non-members of the tribe. Id. This sweeping generalization was qualified by the caveat that tribes retain authority over non-Indians who enter consensual relationships with the tribe or its members. The court stated "A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealings, contracts, leases or other arrangements." Montana v. United States, 450 U.S. at 565, 101 S.Ct. 1245 (citations omitted). The court went on to state, "A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Id.
 
 
 37
 This case involves commercial dealings of a non-Indian company which owns and operates its business under a consensual agreement with the Pueblo. The agreement, in the form of a property lease, requires the company to give preferential hiring to tribal members and it prohibits closed shops as to tribal members. A similar right-to-work provision, expanded to include all employees, was subsequently codified by the Pueblo Tribal Council. The tribe's sovereign status is directly related to its ability to generate revenues through the regulation of commercial activities on the reservation. Lease provisions which restrict closed shops and give preferential hiring to tribal members are indeed internal economic matters which directly affect a sovereign's right of self-government.
 
 
 38
 We conclude that the Pueblo has the inherent right to adopt an ordinance which regulates the commercial activities of a non-Indian company on tribal land operating under a lease with the tribe, absent express statutory language to the contrary.
 
 IV. Conclusion
 
 39
 We hold that the NLRA does not preempt a tribal government from the enactment and enforcement of a right-to-work tribal ordinance applicable to employees of a non-Indian company who enters into a consensual agreement with the tribe to engage in commercial activities on a reservation.
 
 
 40
 Accordingly, we affirm the decision of the district court.
 
 
 
 Notes:
 
 
 *
 The Honorable H. Dale Cook, Senior United States District Judge for the Northern, Eastern and Western Districts of Oklahoma, sitting by designation
 
 
 [1]
 Section 15(A)(5) of the lease provides in relevant part:
 Lessee will not enter into any contract or other arrangement which would require a Tribal member to be a member of a union, league, guild, club, or association (hereinafter collectively referred to as "union") in order to be entitled to all of the priorities to be accorded him pursuant to this Property Lease. Tribal members will not be required to join or maintain membership in, or pay any dues or assessments to, any union in order to be hired and benefit from the priorities stated in this Lease.
 
 
 [2]
 The Assistant Regional Solicitor for the Department of the Interior has opined that the right-to-work provision is valid and enforceable
 
 
 [3]
 Section 6(a) of the ordinance provides:
 No person shall be required, as a condition of employment or continuation of employment on Pueblo lands, to (i) resign or refrain from voluntary membership in, voluntary affiliation with, or voluntary financial support of a labor organization; (ii) become or remain a member of a labor organization; (iii) pay dues, fees, assessments or other charges of any kind or amount to a labor organization; (iv) pay to any charity or other third party, in lieu of such payments any amount equivalent to a pro-rata portion of dues, fees, assessments or other charges regularly required of members of a labor organization; or (v) be recommended, approved, referred or cleared through a labor organization.
 Section 6(b) of the ordinance provides:
 No employer shall deduct from the wages, earnings, or compensation of any employee any union dues, fees, assessments or other charges to be held for, transferred to or paid over to a labor organization, unless the employee has first presented and the employer has received a signed written authorization for the deductions. The employee may at anytime revoke the authorization for deductions by giving written notice of revocation to the employer.
 
 
 [4]
 Prior to the enactment of the Wagner Act in 1935, the states had the right to regulate or prohibit closed shops and other forms of union-security agreements. Section 8(3) stated that nothing shall preclude a state from prohibiting closed shops, but it left open the power of a state to enforce the restrictionSchermerhorn I, 375 U.S. at 99 n. 2, 84 S.Ct. 219. The Schermerhorn I court explained:
 Section 14(b) came into the law in 1947, some years after the Wagner Act. The latter did not bar as a matter of federal law an agency-shop agreement. Section 8(a)(3) of the Taft-Hartley Act also allowed it, saying that "nothing in this Act, or in any other statute of the United States, shall preclude" one. Schermerhorn I, 375 U.S. at 99-100, 84 S.Ct. 219.
 Appellants argue that section 14(b) is limited to "State or Territorial law" so that only a state or territory, and not an Indian tribe, may prohibit agreements conditioning employment on union membership. "By the time § 14(b) was written into the Act, twelve states had statutes or constitutional provisions outlawing or restricting the closed shop and related devices.... In 1947 Congress did not outlaw union-security agreements per se; but it did add new conditions.... In other words, Congress undertook pervasive regulation of union-security agreements, raising in the minds of many whether it thereby preempted the field under the decision in Hill v. Florida, 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed. 1782, and put such agreements beyond state control. That is one reason why a section, which later became § 14(b), appeared in the House bill — a provision described in the House Report as making clear and unambiguous the purpose of Congress not to preempt the field." Id. at 100-101, 84 S.Ct. 219 (emphasis added).
 
 
 [5]
 The legislative history of Title VII reveals that Congress excluded Indian tribes from its provisions in recognition of their sovereign status. Senator Mundt of South Dakota who proposed the exclusion explained that it was necessary to exclude Indians because they "are virtually political subdivisions of the Government." He explained, "[t]his amendment would provide to American Indian tribes in their capacity as a political entity [sic], the same privileges accorded to the U.S. Government and its political subdivisions, to conduct their own affairs and economic activities without consideration of the provisions of the bill." 110 Cong.Rec. 13,702 (1964)
 
 
 
 41
 MURPHY, Circuit Judge, Dissenting.
 
 
 42
 This case involves the question of whether § 8(a)(3) of the NLRA applies to Indian tribes, such that the Pueblo is precluded from enacting legislation which prohibits employers operating on tribal lands from including union security provisions in collective bargaining agreements. The majority resolves this narrow but difficult question by concluding that Congress did not, either expressly or by implication, divest the Pueblo of its power as a sovereign to enact such legislation.
 
 
 43
 As a general rule, Indian tribes possess those sovereign powers neither divested of them by treaty or act of Congress nor inconsistent with the superior status of the United States. See United States v. Wheeler, 435 U.S. 313, 323, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). One of the sovereign powers retained by Indian tribes is the power of self-governance. See Santa Clara Pueblo v. Martinez, 436 U.S. 49, 55, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). An Indian tribe may exercise its power of self-governance by regulating "the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealings, contracts, leases, or other arrangements." Montana v. United States, 450 U.S. 544, 565, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). Tribal regulations, however, may not directly conflict with federal statutes applicable to Indian tribes. It is beyond debate that "Congress has plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess." Martinez, 436 U.S. at 56, 98 S.Ct. 1670. A tribe's power of self-governance, therefore, is limited by applicable federal statutes.
 
 
 44
 Congress may manifest its intent to apply a federal statute to Indian tribes by including language in the statute specifically indicating that the statute is intended to apply to tribes. See Donovan v. Navajo Forest Prods. Indus., 692 F.2d 709, 712 (10th Cir.1982). Even in the absence of such express language, Congress' clear intention to include Indian tribes within the ambit of a federal statute can be implied from the legislative history or from the existence of a statutory plan so exhaustive that it constitutes a comprehensive federal regulatory scheme preempting tribal regulation. See, e.g., Phillips Petroleum Co. v. EPA, 803 F.2d 545, 553-58 (10th Cir.1986) (concluding that the Safe Drinking Water Act, a comprehensive federal statute that at the time did not directly address Indians, applied to Indian tribes); cf. White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 151 & n. 15, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) (holding that preemption of state authority can be inferred when the federal regulatory scheme is comprehensive and pervasive).
 
 
 45
 Section 8(a)(3) of the NLRA "permits employers as a matter of federal law to enter into agreements with unions to establish union or agency shops" and "articulates a national policy that certain union-security agreements are valid as a matter of federal law." Oil, Chemical & Atomic Workers, Int'l Union v. Mobil Oil Corp., 426 U.S. 407, 409, 416, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976). Section 8(a)(3) prohibits the "closed-shop" but permits other union security agreements that comply with its provisions. See id. at 409 n. 1, 96 S.Ct. 2140. For example, while initial employment cannot be conditioned on an employee's membership in the union, § 8(a)(3) allows employers and unions to enter into collective bargaining agreements that require newly-hired employees to join the union within thirty days of their hire. The ordinance enacted by the Pueblo prohibits a union security agreement otherwise allowed under § 8(a)(3) and, therefore, directly conflicts with § 8(a)(3).
 
 
 46
 Section 14(b), which was added to the NLRA in 1947 and codified at 29 U.S.C. § 164(b), permits a "State or Territory" to enact legislation prohibiting the types of union security agreements otherwise allowed under § 8(a)(3). Prior to the enactment of § 14(b), Congress' "pervasive regulation of union-security agreements, rais[ed] in the minds of many whether it thereby preempted the field ... and put such agreements beyond state control." Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn, 375 U.S. 96, 100-01, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963) (both emphases added). Thus, Congress added § 14(b) to the NLRA either to clarify that § 8(a)(3) did not preempt state and territorial regulation of certain union security agreements, or to acknowledge that because § 8(a)(3) completely preempted the field, § 14(b) was necessary to provide an exception to the application of § 8(a)(3) for states and territories. In either event, it is unreasonable to go further and assume that Congress' narrowly-crafted exemption for states and territories was intended as a wholesale abdication of federal control over union security agreements. Thus, even in light of the addition of § 14(b) to the NLRA, the comprehensiveness of federal regulation of union security agreements demonstrates Congress' intent to abrogate the powers of Indian self-governance in this area.
 
 
 47
 The Pueblo takes the position that § 14(b) did more than simply create a limited exception to § 8(a)(3) applicable only to states and territories. The Pueblo argues that because § 14(b) provides an exception to the application of § 8(a)(3), comprehensive federal regulation of union security agreements no longer exists and the field is therefore no longer preempted by federal law. The Pueblo then argues that in the absence of comprehensive federal regulation of union security agreements, Indian self-governance of such agreements cannot be abrogated absent express language in the statute or in the legislative history. Because § 8(a)(3) is not expressly made applicable to Indian tribes by either the text or the legislative history of § 8(a)(3), the Pueblo argues that it is free to enact legislation prohibiting union security agreements. The Pueblo so argues despite Congress' failure to specifically include Indian tribes in the § 14(b) exception.
 
 
 48
 The majority acknowledges that Congress can abrogate Indian sovereignty by enacting a comprehensive and pervasive federal statute. The majority concludes, however, that because § 14(b) creates an exception to the otherwise pervasive federal regulation of union security agreements, the field of union security agreements is no longer preempted by § 8(a)(3). The majority then concludes that nothing in the text or legislative history of § 8(a)(3) evinces Congressional intent to apply § 8(a)(3) to Indian tribes and, therefore, § 8(a)(3) does not preempt tribal ordinances like the one enacted by the Pueblo.
 
 
 49
 I agree with the majority's conclusion that the NLRA and the legislative history are silent as to the application of § 8(a)(3) to Indian tribes. I also agree that Indian sovereignty cannot be abrogated by Congressional silence. I disagree, however, with the majority's conclusion that federal law no longer preempts tribal regulation of union security agreements like those prohibited by the Pueblo's ordinance.
 
 
 50
 If the field of union security agreements is no longer preempted because of § 14(b), local governments and municipalities located in states that have not enacted right-to-work laws could enact their own right-to-work ordinances even though they are generally prohibited from doing so by § 8(a)(3) and are not specifically exempted in § 14(b).[1] It is unreasonable to believe that by creating an exceedingly narrow exception to the application of § 8(a)(3) Congress intended to relinquish all control over union security agreements. A comprehensive search of federal case law has revealed no case in which any court has concluded that Congress' act of creating a limited exception to an otherwise comprehensive federal statute has had the effect of completely eliminating federal preemption. The creation of an exception to a comprehensive statute can have no impact on the preemptive effect of the statute on any person or entity other than those specifically named in any such exception.[2] Thus, I disagree with the majority's conclusion that federal regulation of union security agreements no longer preempts the tribal ordinance at issue in this case.
 
 
 51
 In Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board, the Supreme Court stated that "§ 14(b) was included [in the NLRA] to forestall the inference that federal policy was to be exclusive." 336 U.S. 301, 314, 69 S.Ct. 584, 93 L.Ed. 691 (1949). The majority concludes that this statement in Algoma Plywood constitutes an expression of the Court's position that the field of union security agreements is no longer preempted by federal law. The Court's statement, however, is simply an acknowledgment that § 14(b) allowed states to prohibit union security agreements otherwise allowed by § 8(a)(3). Section 14(b) did nothing more than carve out a narrow exception to the general rule that unions and employers have the right to include certain union security agreements in collective bargaining agreements; this exception is limited by the express terms of § 14(b) to states and territories.
 
 
 52
 Not only does the exception, by its express terms, apply only to states and territories, but it is also limited in its scope. While § 14(b) allows states and territories to enact legislation prohibiting union security agreements otherwise allowed under § 8(a)(3), it does not permit states and territories to enact legislation allowing union security agreements otherwise prohibited by § 8(a)(3), e.g., agreements that require an employee to belong to the union as a condition of initial employment. The Supreme Court has recognized that "§ 14(b) was designed to prevent other sections of the [NLRA] from completely extinguishing state power over certain union-security arrangements." Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn, 373 U.S. 746, 751, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963) (both emphases added). Thus, § 14(b) has been interpreted as an extremely limited exception to § 8(a)(3). Congress, by providing an exceedingly narrow exception to the otherwise broad application of § 8(a)(3), did not intend to relinquish federal control over all union security agreements. The relinquishment is confined to those situations and entities specifically delineated in § 14(b).
 
 
 53
 It is clear that Congress' intent to abrogate Indian sovereignty can be inferred from the pervasiveness of the statutory scheme. See White Mountain Apache Tribe, 448 U.S. at 151, 100 S.Ct. 2578. Except as otherwise expressly provided in § 14(b), the comprehensive nature of federal regulation of union security agreements evinces Congressional intent to include Indian tribes within the ambit of § 8(a)(3); tribes are therefore precluded from enacting legislation that directly conflicts with § 8(a)(3). Cf. Phillips Petroleum Co., 803 F.2d at 553-58. I would hold that, except as otherwise expressly provided in § 14(b), the field of union security agreements remains preempted by federal statute and the Pueblo's ordinance prohibiting union security agreements is preempted by § 8(a)(3) of the NLRA. Accordingly, I would reverse the judgment of the district court.
 
 
 
 Notes:
 
 
 [1]
 The only two reported cases that have addressed this issue have both concluded that federal law preempts the regulation of union security agreements by local governmental entitiesSee New Mexico Fed'n of Labor v. City of Clovis, 735 F.Supp. 999, 1002-03 (D.N.M.1990); Kentucky State AFL-CIO v. Puckett, 391 S.W.2d 360, 362 (Ky.1965).
 
 
 [2]
 The Pueblo's alternative argument, that it should be included in the term "States or Territories," is also unpersuasive. The Supreme Court has determined that Indian reservations are not states,see White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980), and this court has held that Indian tribes are not local governmental agencies. See United States v. Barquin, 799 F.2d 619, 621 (10th Cir.1986). Indian tribes are also not territories of the United States. Because nothing in the language or legislative history of § 14(b) indicates that Congress intended Indian tribes to be included in the term "States or Territories," I also reject the Pueblo's alternative argument and conclude that Indian tribes are not included in the exception provided by § 14(b).