In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2806

MENOMINEE TRIBAL ENTERPRISES,

*Petitioner*,

*v.*

HILDA L. SOLIS, Secretary of Labor,

*Respondent.*

Petition for Review of an Order of the
Occupational Safety and Health Review Commission.
No. 08-0404.

ARGUED FEBRUARY 19, 2010—DECIDED MARCH 24, 2010

Before POSNER, FLAUM, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge.* The Menominee Indian tribe owns a sawmill on its reservation in Wisconsin. The Department of Labor cited the tribe (technically the tribal entity that operates the sawmill, but it has no substantial existence apart from the tribe) for violations of OSHA, 29 U.S.C. §§ 651 *et seq.*, rejecting the tribe's contention, renewed in this petition to review the Department's

decision, that it is exempt. The Department asks us to ignore some of the arguments that the tribe makes on the ground that they were not made at the administrative level. That may be right, but they are pure issues of law, they have been briefed and argued, and for us to refuse to resolve them would simply invite future litigation between these parties. OSHA's exhaustion provision, 29 U.S.C. § 660(a), allows for exceptions, although the provision refers to "extraordinary circumstances" and so has been construed narrowly. *Globe Contractors, Inc. v. Herman*, 132 F.3d 367, 370-71 (7th Cir. 1997); *Harry C. Crooker & Sons, Inc. v. OSHRC*, 537 F.3d 79, 85 (1st Cir. 2008); *Todd Shipyards Corp. v. Secretary of Labor*, 586 F.2d 683, 688-89 (9th Cir. 1978); see also *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1, 23-24 (1974).

The Occupational Safety and Health Act contains an express exemption for the federal government (except the Postal Service) and for state and local governments, 29 U.S.C. § 652(5), but says nothing about Indian tribes. We cannot terminate this lawsuit with that observation, however (though neither can we accept the tribe's contention that since a tribe is just like a state or a local government it is within the express exemption for state and local government). Statutes of general applicability that do not mention Indians are nevertheless usually held to apply to them. *FPC v. Tuscarora Indian Nation*, 362 U.S. 99, 116 (1960) ("a general statute in terms applying to all persons includes Indians and their property interests"); *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 932 (7th Cir. 1989) ("general statutes . . . whose con-

cerns are widely inclusive and do not affect traditional Indian or Tribal rights"); *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113, 1116 (9th Cir. 1985); Felix S. Cohen, *Handbook of Federal Indian Law* § 2.03, pp. 128-32 (2005 ed.); William Buffalo & Kevin J. Wadzinski, "Application of Federal and State Labor and Employment Laws to Indian Tribal Employers," 25 *U. Memphis L. Rev.* 1365, 1377-83 (1995); Vicki J. Limas, "Application of Federal Labor and Employment Statutes to Native American Tribes: Respecting Sovereignty and Achieving Consistency," 26 *Ariz. St. L.J.* 681, 694-700 (1994).

But there are exceptions; a statute of general applicability will be held inapplicable to Indians if it would interfere with tribal governance, as in *Reich v. Great Lakes Indian Fishing & Wildlife Comm'n*, 4 F.3d 490 (7th Cir. 1993), where we rejected the application of the Fair Labor Standards Act to Indian game wardens. Or if it would clash with rights granted Indians by other statutes or by treaties with Indian tribes (which are the legal equivalent of federal statutes, *Ward v. Race Horse*, 163 U.S. 504, 510-11 (1896); *Menominee Indian Tribe of Wisconsin v. Thompson*, 161 F.3d 449, 457 (7th Cir. 1998); *Reich v. Great Lakes Indian Fish & Wildlife Comm'n*, *supra*, 4 F.3d at 493; *Solis v. Matheson*, 563 F.3d 425, 434 (9th Cir. 2009)). *Morton v. Mancari*, 417 U.S. 535, 550 (1974); *United States v. Smiskin*, 487 F.3d 1260, 1264 (9th Cir. 2007); *EEOC v. Cherokee Nation*, 871 F.2d 937, 938 (10th Cir. 1989). Or if there is persuasive evidence that Congress did not intend by its silence that the statute would apply to Indians. *Taylor v. Alabama Intertribal Council Title IV J.T.P.A.*, 261 F.3d 1032, 1035 (11th Cir. 2001) (per curiam);

*United States v. Jackson*, 600 F.2d 1283, 1286-87 (9th Cir. 1979).

The first and third of these exceptions are inapplicable. The Menominees' sawmill is just a sawmill, a commercial enterprise. And there is no indication in OSHA, or its legislative history, that the statute's silence with regard to Indian tribes meant that Congress intended that OSHA not be applicable to tribes. The second exception, however, which requires considering whether the federal statute would infringe rights granted Indian tribes by other statutes or by treaties, is potentially applicable.

By a series of treaties with the federal government made between 1831 and 1856, a reservation was created for the Menominee Indians in a Wisconsin forest. In 1908 the Bureau of Indian Affairs built a sawmill on the reservation and having done so the Bureau managed it for the benefit of the tribe. But in 1954 Congress terminated federal control over the Menominees' reservation, thus subjecting it to governance by the State of Wisconsin. As part of the termination, the sawmill was transferred to a corporation owned by the tribe. Menominee Termination Act, 25 U.S.C. §§ 891 *et seq*.

The period between 1943 and 1961 has been called the "termination era" by scholars of federal Indian policy. The Menominees were just one of seventy tribes and bands terminated in 1954. Cohen, *supra*, § 1.06, p. 95. "Under Termination, the federal government pursued a policy of ending its special relationship with Indian tribes and transferring tribal territories to the members individually

or as shareholders in state chartered corporations." Bethany R. Berger, "Red: Racism and the American Indian," 56 *UCLA L. Rev.* 591, 641-42 (2009).

The Menominees soured on termination. They (or at least their leaders) didn't think that the Wisconsin taxes and regulations to which termination exposed the tribe and its enterprises (including the sawmill) were offset by benefits received from the state. They were also unhappy to see tribal lands pass into private ownership. So they complained to Congress, which in 1973 passed the Menominee Restoration Act, 25 U.S.C. §§ 903 *et seq.* The Act restored the tribe and its property, including the sawmill, to their status under the treaties. 25 U.S.C. §§ 903a(b), 903d; see Joseph F. Preloznik & Steven Felsenthal, "The Menominee Struggle to Maintain Their Tribal Assets and Protect Their Treaty Rights Following Termination," 51 *N. Dak. L. Rev.* 53, 68-70 (1974). The tribe negotiated the details of the restoration with the Department of the Interior. In 1975 the results of the negotiations, so far as pertained to the sawmill, were embodied in the "Management Plan of Menominee Enterprises, a Tribal Enterprise of the Menominee Indian Tribe of Wisconsin."

The Restoration Act had required that the Management Plan be submitted to Congress, which would have 60 days to pass a resolution of disapproval before the plan took effect. 25 U.S.C. §§ 903d(a), (b). The 60 days elapsed without either house of Congress taking any action.

The Act provides that "there are hereby reinstated all rights and privileges of the tribe or its members under

Federal treaty, statute, or otherwise which may have been diminished or lost pursuant to" the Termination Act. 25 U.S.C. § 903a(b); see also *id.*, §§ 903a(c), (d). But all that we are pointed to in the treaties, or any laws, that is contended to have exempted the sawmill from federal regulation before the Termination Act is a provision of the 1856 treaty that if any earlier treaty or agreement "should prove insufficient," the President or Congress may "adopt such policy in the management of the affairs of the Menominees as in [their] judgment may be most beneficial to them." Treaty of 1856, art. 3, §1, 11 Stat. 679. This is permissive rather than directive—is classic "precatory" language, see *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 19 (1981); *Perry v. Housing Authority of City of Charleston*, 664 F.2d 1210, 1217-18 and n. 14 (4th Cir. 1981); *Medellin v. Texas*, 128 S. Ct. 1346, 1358-59 (2008); *Sturgis v. Paine*, 16 N.E. 21 (Mass. 1888) (Holmes, J.)—and even if directive would be too vague to create an exemption from OSHA. *U.S. Dep't of Labor v. OSHRC*, 935 F.2d 182, 186-87 (9th Cir. 1991); see also *Smart v. State Farm Ins. Co.*, *supra*, 868 F.2d at 934-35.

   With the Act unavailing, the tribe asks us to treat the Management Plan as if it were a statute, because it was submitted to Congress for [dis]approval. Congress can if it wants require advance submission of regulations to it, to make it easier for it to prohibit them. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 689-90 (1987); *INS v. Chadha*, 462 U.S. 919, 935 n. 9 (1983); *Sibbach v. Wilson & Co.*, 312 U.S. 1, 15-16 (1941); *United States v. Scampini*, 911 F.2d 350, 353-54 (9th Cir. 1990). But its failure to exercise its option of prohibiting them does not make them statutes;

Article I of the Constitution prescribes the exclusive procedure for enacting federal statutes. *Clinton v. City of New York*, 524 U.S. 417, 439-40 (1998); *INS v. Chadha*, *supra*, 462 U.S. at 951; *Sobitan v. Glud*, 589 F.3d 379, 384 (7th Cir. 2009).

Occasionally, though, a court will treat a failure to disapprove a submitted regulation as *some* evidence of congressional approval of the regulation, *Bob Jones University v. United States*, 461 U.S. 574, 600-01 (1983); *North Haven Board of Education v. Bell*, 456 U.S. 512, 533-35 (1982); *Federal Election Commission v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 34 (1981)—evidence similar to that furnished by legislative history, which federal courts still use—if with diminished enthusiasm, *BedRoc Ltd. v. United States*, 541 U.S. 176, 186-87 and n. 8 (2004); *Livingston Rebuild Center, Inc. v. Railroad Retirement Board*, 970 F.2d 295, 297-98 (7th Cir. 1992); *Continental Can Co. v. Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund*, 916 F.2d 1154, 1157-58 (7th Cir. 1990); see also Adrian Vermeule, "Legislative History and the Limits of Judicial Competence: The Untold Story of *Holy Trinity Church*," 50 *Stan. L. Rev.* 1833 (1998)—for help in trying to ascertain statutory meaning. In dealing with the awkward issue of federal regulation of Indians (awkward because of the nation's history of mistreatment of Indians), courts, as we said, search for evidence of congressional forbearance beyond what can be found in the text of treaties and statutes.

But even if we assumed that the Management Plan expressed the will of Congress, we could not find

support for the proposition that Congress wanted to exempt the Menominees' sawmill from OSHA. A rider to the plan, called the "Trust and Management Agreement," states that "the Secretary shall have no authority in regard to the management of the tribal business, except as specifically provided in this agreement"—but the "Secretary" referred to is the Secretary of the Interior, not the Secretary of Labor. Paragraph 4(f) of the plan authorizes the tribal enterprise that manages the sawmill "to make and amend reasonable rules and regulations concerning the use of the subject property." Since the Management Plan was to be executed by the tribal enterprise, the enterprise needed authority to make rules and regulations for the sawmill's operations. That doesn't imply authority to preempt federal law. States have broad regulatory authority too, but it does not authorize them to opt out of federal statutes. A state cannot legislate an exemption from OSHA, and neither can a tribe.

The tribe does not argue that OSHA fails to make a good fit with the operation of a sawmill on an Indian reservation. On the contrary, asked at argument whether there was anything special about a sawmill owned and operated by an Indian enterprise that might make OSHA unsuitable for application to such an enterprise, the tribe's lawyer answered no. He said that the tribe makes every effort to comply with OSHA, that it seeks the advice of the Occupational Safety and Health Administration, and that its objection is merely to having to pay fines if it fails to comply. The sawmill's output (some $20 million worth in 2005, the latest date for which the

record contains such data) is sold in interstate commerce, in competition with sawmills owned by non-Indian enterprises. Exempting a sawmill owned by an Indian tribe from the obligations that OSHA imposes on its competitors seems hardly necessary to implement the Restoration Act or the Management Plan, let alone the 1856 treaty or any earlier treaty.

The scanty case law on the application of OSHA to Indian tribes does not support the Menominees' claim to be exempt. There are four potentially relevant cases: *Reich v. Mashantucket Sand & Gravel*, 95 F.3d 174, 182 (2d Cir. 1996); *U.S. Dep't of Labor v. OSHRC*, *supra*, 935 F.2d at 187; *Donovan v. Coeur d'Alene Tribal Farm*, *supra*, 751 F.2d at 1117-18, and *Donovan v. Navajo Forest Products Industries*, 692 F.2d 709, 714 (10th Cir. 1982). Only the last-cited case rejects the exemption. In *Mashantucket* the tribal enterprise employed non-Indians as well as Indians and was primarily engaged in construction of a casino engaged in interstate commerce. Since non-Indians are not subject to tribal jurisdiction, the enterprise could not be thought part of the tribe's governance structure. *Coeur d'Alene Tribal Farm* was similar: the Indian enterprise employed non-Indians in a commercial enterprise. We don't have that here; but it is equally the case that the sawmill is not part of the Menominee's governance structure; it is just a sawmill.

In *U.S. Dep't of Labor v. OSHRC*, the question was whether a tribal rule excluding non-Indians from the tribe's reservation applied to OSHA inspectors, in which event, as a practical matter, OSHA would not be enforceable in the reservation. In answering "no," the court

pointed out that a "yes" answer would prevent the enforcement of virtually all federal laws on the reservation.

*Navajo Forest Products Industries* answered the same question "yes," but relied on a provision in a treaty between the United States and the Navajo tribe which stated that "the United States agrees that no persons except those herein so authorized to do, and except such officers, soldiers, agents and employees of the government, or of the Indians, as may be authorized to enter upon Indian reservations in discharge of duties imposed by law, or the orders of the President, shall ever be permitted to pass over, settle upon, or reside in, the territory described in this article." 692 F.3d at 711. The key phrase is "as may be authorized to enter upon Indian reservations in discharge of duties imposed by law," and is ambiguous. But even if it means that there must be express statutory authority to enter a reservation, there is nothing like that here. The only treaty that the tribe relies on—the Treaty of 1856—states, with regard to access to the reservation, only that "all roads and highways, laid out by authority of law, shall have right of way through the lands of the said Indians on the same terms as are provided by law for their location through lands of citizens of the United States."

We conclude that the sawmill and related commercial activities of the Menominees' enterprise are subject to the Occupational Safety and Health Act. The petition for review is therefore

DENIED.